898 F.2d 147
 29 Fed. R. Evid. Serv. 988
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald E. ALTHOFF, Defendant-Appellant.
 No. 89-5527.
 United States Court of Appeals, Fourth Circuit.
 Argued: Dec. 8, 1989.
Decided: Feb. 23, 1990.
Rehearing and Rehearing In Banc Denied March 16, 1990.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Paul V. Niemeyer, District Judge. (CR-88-283-PN).
 Sharon Earle Gregory, Morchower, Luxton and Whaley, Richmond, Virginia, for appellant.
 James Richard Alsup, Assistant United States Attorney, Baltimore, Maryland for appellee. On brief: Martha F. Rasin, Annapolis, Maryland, for appellant. Breckinridge L. Willcox, United States Attorney, Baltimore, Maryland, for appellee.
 D.Md.
 AFFIRMED AND REMANDED.
 Before WIDENER and WILKINSON, Circuit Judges, and JAMES R. SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Donald E. Althoff appeals his conviction in the United States District Court for the District of Maryland on five counts of mail fraud, in violation of 18 U.S.C. Sec. 1341, and six counts of interstate transportation of money taken by fraud, in violation of 18 U.S.C. Sec. 2314. He argues that the district court erred in permitting the government to elicit testimony concerning civil default judgments obtained against him. He also complains about numerous remarks made by the government during the course of trial which he contends deprived him of a fair trial. Finally, he asserts that there was insufficient evidence to convict him on two of the counts against him. While we find that the district court erred in admitting evidence of the default judgments, we hold that in light of the overwhelming evidence of Althoff's guilt, this error was harmless. Finding Althoff's other contentions to be without merit, we affirm the district court's judgment of conviction. However, because the district court in sentencing Althoff failed to comply with the procedures of the Victim and Witness Protection Act, 18 U.S.C. Secs. 3579-3580, we remand the case for compliance with those procedures.
 
 I.
 
 2
 Donald Althoff moved to Annapolis, Maryland, from Erie, Pennsylvania, in September 1984, and began working for Money Management Associates, a computerized bookkeeping service, in January 1985. During this time he devised a plan to create his own company for the development of business applications for home computers. The first of these applications was to be the printing by home computers of special business cards to be kept in a Rolodex file. Althoff called the cards "Keeper Kards."
 
 
 3
 In the fall of 1985, two mail solicitations for the Keeper Kards were conducted. These solicitations were aimed primarily at businesses in the Baltimore, Annapolis, and Washington, D.C. areas, and involved 500 or fewer mailings each. There was little positive response from the mailings as Althoff sold only two or three orders of 50 cards each, amounting to gross receipts of $20 to $30.
 
 
 4
 Nonetheless, Althoff pressed on with his idea of establishing a nationwide network of production centers that would produce Keeper Kards through computers in people's homes. Each home computer was to be tied in to a central computer located at the headquarters of Timcorp, Inc., a corporation Althoff established to oversee the system. On December 1, 1985, Althoff began advertising in Virginia and Pennsylvania newspapers for the sale of production centers. The advertisements indicated that a $12,000 payment would be required to obtain a production center, but that the payment would be secured by $34,500 in equipment and inventory.
 
 
 5
 A number of persons responded to the advertisements, and Althoff mailed each of them promotional literature. Among other things, the promotional literature stated that "two months ago we started selling Keeper locally and found that the response was more than we could handle," when in fact the mail solicitations had generated virtually no sales. The literature also stated that "we have budgeted $425,000" for an extensive national advertising campaign, when in fact no money was available for such a campaign. In addition, the literature stated that "our figures show a market potential of slightly over two billion cards per year in this country," when no national marketing studies had been performed and the local marketing efforts had been unsuccessful. Finally, the potential investors were informed that in addition to the computer system, they would receive a fixed inventory of 100,000 cards which would be repurchased from them "at the rate of $.08 per card" if the network did not work, when in fact the cards had actually cost only $.006 each.
 
 
 6
 In addition to these written representations, Althoff also made numerous oral representations to potential investors. He led several investors to believe that he was very wealthy and had made a substantial personal investment in Timcorp. In fact, he had almost no assets and no personal monetary investment in the company. Althoff also led investors to believe that Timcorp was a financially substantial company with significant assets and resources, when in reality it had little capital other than money obtained from the sale of production centers to investors.
 
 
 7
 In December 1985 and January 1986, Timcorp sold four production centers and collected $48,000. Because of the response to the initial newspaper advertisements, Althoff raised the price of the production centers to $18,000 and expanded his advertising campaign to be national in scope.
 
 
 8
 As Timcorp enjoyed further successes in the sale of production centers, Althoff became increasingly extravagant in spending Timcorp's funds. The company's banking records reveal payments for a number of expensive dinners, downpayments on three Florida condominiums, and $3,500 in yacht rentals. Several vehicles were also purchased with corporate funds, but were registered in the names of employees rather than in the company's name. Throughout this period, Althoff kept all assets out of his own name. He did not own a car or house, nor did he even maintain a personal checking or savings account. Although Althoff received no salary from Timcorp, his expenses were paid for out of corporate funds.
 
 
 9
 By mid-summer 1986, Althoff raised the price of the production centers to $24,000. However, Timcorp began experiencing difficulties in obtaining further investors, and new investment in the company came to a virtual halt. Cash flow problems developed as several employees' pay checks bounced and the company went in default on several loans. By this time, Timcorp had sold 30 production centers. Only thirteen of the production centers had been provided with equipment, however. Only a few had received inventories of approximately 5,000 Rolodex cards, and none had received the promised 100,000 card inventory. No investor received equipment and inventory valued at $34,500 as promised in the initial advertisement. Also, no advertising was ever conducted for the sale of Keeper Kards.
 
 
 10
 Investors became concerned as no production of Keeper Kards had started, no national advertising campaign had begun, and many of them had yet to receive their equipment. In an attempt to allay the investors' fears, Althoff began sending them newsletters containing false information. A newsletter of April 25, 1986, falsely indicated that Timcorp had established a new marketing headquarters in Atlanta, Georgia. A newsletter of July 16, 1986, announced that Timcorp's former banker, William Aragoni, had accepted a position with Timcorp as vice-president of finance, and that "Timcorp's rapid growth and long range potential were the principal reasons given for this unusual career change." In fact, Aragoni had accepted the position with Timcorp after having been fired from the Heritage International Bank for misconduct. This newsletter also indicated that Aragoni would head the company's $57 million capital equipment program, when in fact Timcorp was unable to repay a $45,000 loan to Heritage International Bank and had no means of starting a $57 million equipment program.
 
 
 11
 In late 1986, investors began to demand refunds on their investments. When the refunds were not forthcoming, a number of the investors complained to the Better Business Bureau, and several eventually sued Althoff and won default judgments against him. The Federal Bureau of Investigation was also contacted, and it instituted an investigation of Althoff.
 
 
 12
 Althoff was indicted by a grand jury and on November 18, 1988, he was convicted after a jury trial on five counts of mail fraud, in violation of 18 U.S.C. Sec. 1341, and six counts of interstate transportation of money taken by fraud, in violation of 18 U.S.C. Sec. 2314. He was sentenced to a four-year prison sentence followed by five years probation, and was ordered to pay $581,100 restitution during the probationary period.
 
 
 13
 This appeal followed.
 
 II.
 
 14
 Althoff contends that the district court erred in allowing the government to introduce evidence that some of the dissatisfied investors had obtained civil default judgments against him. He argues, inter alia, that the testimony of the investors that they had obtained default judgments should have been ruled inadmissible because its probative value was outweighed by its prejudice.
 
 
 15
 We agree that the district court erred in admitting this testimony. Federal Rule of Evidence 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Here, the government sought to introduce evidence of the civil default judgments in order to demonstrate that Althoff, as part of his fraudulent scheme, had sought to make himself judgment proof. Evidence of the civil default judgments was of only the slightest probative value, however. Althoff may have allowed the default judgments to be entered against him for numerous strategic reasons which say little, if anything, about his guilt or innocence on the charges of fraud. The risk of unfair prejudice was high, however. Despite the trial judge's cautionary instruction, "we know from common experience that a jury would probably follow the finding ... as found in the civil action." Green v. State, 184 N.E. 183, 187 (Ind.1933); see also Nordgren v. Mitchell, 716 F.2d 1335, 1339 (10th Cir.1983) (stating that admission of civil judgment to prove an element of the crime in criminal case "presumably would be error prejudicial to the defendant"). Because the danger of unfair prejudice far outweighed the probative value of the default judgments, we hold that the district court erred in admitting this testimony.
 
 
 16
 However, after reviewing the evidence against Althoff, we find that admission of the civil default judgments was harmless error. See United States v. Porter, 821 F.2d 968, 977 (4th Cir.1987). The government presented evidence that Althoff authored misleading newspaper advertisements, issued false promotional materials and informational newsletters, and made oral misrepresentations to potential investors. Furthermore, evidence was presented that he spent corporate funds extravagantly while protecting himself from possible judgments by maintaining no assets in his own name. Potential investors relied to their detriment upon Althoff's misrepresentations and were thereby defrauded. In light of the evidence of Althoff's guilt, we have no difficulty in finding that the district court's error in admitting evidence of the default judgments did not affect the jury's verdict. See United States v. Urbanik, 801 F.2d 692, 698-99 (4th Cir.1986).
 
 III.
 
 17
 Althoff also cites as error numerous statements made by the government during trial which he asserts deprived him of a fair trial. First, Althoff complains that during his cross-examination by the government he was improperly questioned about a number of complaints made by various investors to the Better Business Bureau. Althoff argues that since the actual Better Business Bureau complaints were never entered into evidence and the persons who made the complaints were never called to testify, the government should not have been allowed to pursue this line of questioning. We disagree. Althoff opened the door to this line of questioning by commenting on direct examination that he had received a number of complaints from the Better Business Bureau and that in his opinion one investor in particular was the source of his problems. The government was entitled to explore the extent to which Althoff actually knew who had complained and why they had done so. "A full cross-examination of a witness upon the subjects of his examination in chief is the right, not the mere privilege of the party against whom he is called." United States v. Caudle, 606 F.2d 451, 457 (4th Cir.1979).
 
 
 18
 Second, Althoff maintains that a number of comments made by the government during closing argument were improper. Althoff failed to object to any of these statements on the ground of prosecutorial misconduct, and our review is therefore governed by the plain error standard. "Plain error involves a deficiency so obvious and substantial that the fairness or integrity of the trial is affected." See United States v. Wyatt, 762 F.2d 908, 912 (11th Cir.1985). We think that when the statements made by the government in closing argument are considered in their proper context, it is clear that the district court did not commit plain error in allowing the statements.
 
 
 19
 Althoff asserts that the district court erred in permitting the government to remark that defense counsel had "done the best he c[ould] with what he ha[d] to work with." However, there was no error in permitting the government to indicate that the evidence was strongly in its favor and yet also to compliment defense counsel. Althoff next claims that the district court should not have permitted the government to indicate that defense counsel's comment that Althoff was a poor witness was merely an excuse for a lying client. However, there was nothing improper in the government stating that the fact that Althoff was lying would explain why he was a poor witness. Althoff also complains about the government's comment that when defense counsel was in the Maryland State's Attorney's Office he would have been happy to bring a case such as this, but that some cases are more properly brought by federal prosecutors. The government's statement was in no way improper when viewed in context as rebuttal to defense counsel's assertion that the federal government was prosecuting the case because the state's attorney had refused to do so. Althoff also takes offense at the government's statement that its witnesses were proven to be reliable since Althoff had accepted them as investors based on their honesty and integrity. The government's remark about the credibility of its witnesses was based on evidence in the record and was an appropriate response to defense counsel's efforts to attack the witnesses' credibility. Finally, Althoff argues that the court should not have allowed the government to compare the case to a prominent Maryland savings and loan scandal. This comparison was made for illustrative purposes and was in no way an effort on the part of the government improperly to prejudice the jury.
 
 
 20
 For the foregoing reasons, we think it clear that the district court did not commit error in permitting the government to make the remarks it did. Even if some of the comments were improper, however, it is beyond question that the district court's failure to strike the comments sua sponte did not constitute plain error. "The plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Young, 470 U.S. 1, 15 (1985). This plainly is not such a case.
 
 IV.
 
 21
 Althoff asserts that two of the counts against him were not supported by substantial evidence. First, he maintains that he did not "cause" the interstate transportation of money taken by fraud as required by 18 U.S.C. Sec. 2314 with respect to one investor, Margaret Heistand, since she sent him money based in part on discussions between herself and her husband concerning the investment. This argument is without merit. On appeal of a criminal conviction, the jury verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). Mrs. Heistand testified that both she and her husband relied on misrepresentations in Althoff's advertisement, promotional literature, and newsletters; they sent Althoff a check for $12,000; and they never received any equipment other than a color monitor. This evidence was sufficient for a jury to find that Althoff defrauded Mrs. Heistand and her husband.
 
 
 22
 Second, Althoff contends that substantial evidence does not support his conviction for mail fraud for issuing the newsletter containing false information about the circumstances surrounding the hiring of William Aragoni as Timcorp vice-president. He protests that he did not understand the gravity of Arragoni's offense or the full reason he had been fired. Again, this argument is without merit. Aragoni testified that he informed Althoff of his dismissal by the bank and of the reasons for the dismissal. The jury was clearly justified in finding that Althoff had committed mail fraud in circulating the false newsletter to his investors.
 
 V.
 
 23
 Althoff also protests that the district court failed to comply with the procedures of the Victim and Witness Protection Act, 18 U.S.C. Secs. 3579-80, in sentencing him to pay $581,100 restitution. We agree. The Victim and Witness Protection Act requires that a court ordering restitution first consider a number of factors, including the amount of the loss and the defendant's ability to pay. 18 U.S.C. Sec. 3580. The government has the burden of proving the amount of loss, and the defendant the burden of proving his ability or lack of ability to pay. Id. The district court must place its factual findings with respect to these matters on the record so that meaningful appellate review may be conducted. See United States v. Watchman, 749 F.2d 616, 618 (10th Cir.1984).
 
 
 24
 Here, the district court failed to make factual findings as to the amount of loss incurred or Althoff's ability to pay. As the Ninth Circuit has noted:
 
 
 25
 [W]hen the crime charged involves a scheme to defraud, a sentencing court may order restitution paid to victims of the entire scheme even though all of them are not named in the indictment or information. The amount of restitution, however, must be definite and limited by the amount actually lost by the victims. The court must be able positively to identify each victim to whom restitution is due and, in addition, the defendant must be given the opportunity to refute the amount ordered.
 
 
 26
 United States v. Pomazi, 851 F.2d 244, 250 (9th Cir.1988). We are unable to divine from the present record whether the district court engaged in the factual inquiry necessary to comply with the requirements of the Act. We therefore vacate the order of restitution and remand this case to the district court to make the factual findings mandated by the Victim and Witness Protection Act.
 
 VI.
 
 27
 The judgment of conviction of the district court is affirmed, and the case is remanded for sentencing in compliance with the Victim and Witness Protection Act.
 
 
 28
 AFFIRMED AND REMANDED.