716 F.2d 1335
 Steven NORDGREN, Ron Lyle, Ronnie Lee Gardner and Richard
Ivan Lloyd, Plaintiffs-Appellants,
v.
Anthony W. MITCHELL, Executive Director, Department of
Social Services of the State of Utah, John P. Abbott,
Director of Recovery Services Division of the Department of
Social Services of the State of Utah, and the State of Utah,
Defendants-Appellees.
 No. 81-2283.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 7, 1983.
 
 Brian M. Barnard, Salt Lake City, Utah (John W. Porter, Salt Lake City, Utah, with him on the brief), for plaintiffs-appellants.
 Carlie Christensen, Asst. Atty. Gen., Salt Lake City, Utah (David L. Wilkinson, Atty. Gen., State of Utah, Salt Lake City, Utah, with her on the brief), for defendants-appellees.
 Before SETH, Chief Judge, LOGAN, Circuit Judge, and BRATTON, District Judge*.
 LOGAN, Circuit Judge.
 
 
 1
 The appellants are defendants in paternity actions filed in the Utah state courts. Utah's method of resolving paternity disputes is similar to the Connecticut system described in Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981). When Utah's department of social services pays child support benefits, it becomes the "trustee" of the mother's or child's cause of action for support. Utah Code Ann. Sec. 78-45b-3(1). Paternity and support obligations can be determined in the same action, in which the department is a real party in interest. Id. Secs. 78-45a-2, 78-45b-3(2). The department is under strong financial incentive to establish paternity.[1] The department provides, and in the cases involving these appellants has provided, a lawyer to bring the paternity action against the putative father. See id. Sec. 78-45a-5(2). A mother who has received state aid cannot seek support obligations in a paternity action without notifying the department in writing, which then may join the action. See id. Sec. 78-45-9(2). The mother cannot control or settle the action and must "do whatever ... is necessary in connection with" the action. See id. Sec. 78-45b-3(3), -3(4).
 
 
 2
 Each of the appellants is an inmate in the Utah State Prison and we assume each is indigent.[2] Each appellant filed a motion in his state court paternity case requesting that counsel be appointed to represent him at public expense. The state courts denied these motions. Appellant Nordgren attempted an interlocutory appeal which the Utah Supreme Court refused to grant. Thereafter, the appellants filed this Sec. 1983 action seeking to have the federal district court order the state to provide counsel. The district court 524 F.Supp. 242, granted summary judgment for the State of Utah on stipulated facts. The only issue on appeal is whether the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment requires the state to provide counsel for indigent inmates in paternity proceedings initiated by the state and the mother. For purposes of this appeal the state admits that the Utah State Prison law library is not adequate to provide the legal materials needed to defend paternity actions and that no free legal assistance is available through the prison or through outside legal service organizations to aid prisoners in defending paternity actions.
 
 
 3
 A man who loses a paternity action does not as a direct consequence of that decision face an immediate loss of physical liberty. Therefore, the scope of an indigent's right to counsel in a paternity suit is determined by the two-step analysis enunciated in Lassiter v. Department of Social Services, 452 U.S. 18, 25-27, 101 S.Ct. 2153, 2158-60, 68 L.Ed.2d 640 (1981). The court must first determine whether the due process evaluation contained in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), demands the presence of counsel. Then the court must "set [the] net weight [of the Eldridge balance] in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159.
 
 
 4
 In Eldridge, the Court set forth the following test for determining when the Due Process Clause demands a certain procedural safeguard:
 
 
 5
 "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
 
 
 6
 424 U.S. at 335, 96 S.Ct. at 903. In weighing these factors in the instant case we are guided by the Supreme Court's decision in Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981), issued on the same day as Lassiter, in which the Court held that the Due Process Clause entitled an indigent defendant in a Connecticut paternity proceeding to blood grouping tests furnished at the state's expense.
 
 
 7
 In Little, the Court declared that the putative father's interests in paternity proceedings are compelling:
 
 
 8
 "The private interests implicated here are substantial. Apart from the putative father's pecuniary interest in avoiding a substantial support obligation and liberty interest threatened by the possible sanctions for noncompliance, at issue is the creation of a parent-child relationship. This Court frequently has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection. See Stanley v. Illinois, 405 U.S. 645, 651-652 [92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551] (1972). Just as the termination of such bonds demands procedural fairness, see Lassiter v. Department of Social Services, post, p. 18 [101 S.Ct. p. 2153], so too does their imposition. Through the judicial process, the State properly endeavors to identify the father of a child born out of wedlock and to make him responsible for the child's maintenance. Obviously, both the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination."
 
 
 9
 Id. at 13, 101 S.Ct. at 2209 (footnote omitted).
 
 
 10
 Assessing the extent to which the provision of a lawyer to indigent inmates would enhance the fairness and reliability of the paternity procedure is more difficult. The Utah statute provides that the judge in a paternity case is obligated to order blood tests, see Utah Code Ann. Secs. 78-25-18, 78-45a-7, and Little makes clear that the state must pay for such tests when the defendant is unable to do so. The Court in Little relied for its adoption of this rule on the ability of the tests "to provide a 91% cumulative probability of negating paternity for erroneously accused Negro men and 93% for white men." 452 U.S. at 8, 101 S.Ct. at 2206. Given the availability and quality of these tests, we see no need for appointment of counsel prior to the time the tests are given.[3]
 
 
 11
 In many cases that continue past the blood-test stage, the proceedings are likely to be uncomplicated. The defendant may have lived with the child's mother for a long time in a monogamous relationship that may even have produced other children. Nevertheless, complex cases may arise for which legal services are important. Utah law requires exoneration of the defendant unless the blood tests, or expert opinion based upon blood tests, indicate that the defendant could be the father.[4] While these tests apparently have great accuracy in eliminating a man as the father, they cannot prove that he is the father. Thus, if the blood tests fail to rule out the accused man difficult legal, medical, and scientific questions may arise in the trial. The putative father may wish to challenge the testing procedures or the validity of the results. Such a challenge can involve investigation of the procedures, presentation of expert testimony, cross-examination of the state's experts, and sophisticated legal arguments on admissibility. See Utah Code Ann. Secs. 78-45a-8, -10. Few indigent inmates "are equipped to understand and fewer still to confute" such arguments or expert testimony. Lassiter, 452 U.S. at 30, 101 S.Ct. at 2161.[5] They are likely "to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation." Id. The usually private nature of sexual relations adds further difficulties. A man accused as a father and not eliminated by blood tests may rely on an alibi defense or on a defense based on the existence of other potential fathers. These defenses may require pretrial investigation and discovery. If neither of these defenses proves adequate, the hearing may become essentially a credibility contest between the accusing mother and the denying inmate. In this circumstance, adequate cross-examination skills may, under our system of adversarial truthseeking, become critical both to an adequate defense and to an accurate result.
 
 
 12
 Because of the admitted inadequacy of the prison library, indigent inmates of the Utah State Prison are unable to perform even the most rudimentary legal or medical research for purposes of discovery or trial to which persons on the outside have at least theoretical access. And because the men are incarcerated, their ability to perform even elementary factual investigations that may be critical to their cases is virtually foreclosed. Furthermore, in Utah paternity cases, government lawyers, with all the resources of education, research, and investigation that normally pertain to their offices, advocate both the interests of the mother and the interests of the state. Compare Lassiter, 452 U.S. at 29, 101 S.Ct. at 2160-61 (state "sometimes represented at termination hearings by social workers instead of by lawyers"). This imbalance of litigative power makes the restrictions on the ability of indigent inmates to defend these actions even more consequential. We are convinced that the provision of counsel in cases that proceed after the blood tests have been taken would help ensure the correctness of paternity determinations.
 
 
 13
 The final Eldridge factor is the state's interest in the proceeding. The state has a recognized interest in the welfare and financial support of a child receiving public assistance. Little, 452 U.S. at 14, 101 S.Ct. at 2209. It also has an interest in resolving paternity as inexpensively as possible. Of course, the state shares with the mother, the child, and the defendant the interest in resolving paternity accurately. The presence of a lawyer can enhance the efficiency of a paternity proceeding and, as we have noted, the accuracy of the result. Providing a lawyer would raise the cost of the proceeding, but the Supreme Court's comments in Lassiter are instructive:
 
 
 14
 "But though the state's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession in the respondent's brief that the 'potential costs of appointed counsel in termination proceedings ... is [sic] admittedly de minimis compared to the costs in all criminal actions.' "
 
 
 15
 452 U.S. at 28, 101 S.Ct. at 2160. Utah's interest in monetary savings cannot outweigh the strong private interests of the putative father, the shared interests of all the parties, and the substantial procedural fairness achieved by providing a lawyer for the indigent inmate. An analysis of the Eldridge factors weighs in favor of providing counsel for indigent inmates at the Utah State Prison in paternity cases that proceed after completion of blood tests.
 
 
 16
 The next analytical step is to determine whether the conclusion dictated by the Eldridge factors outweighs the "presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of liberty." Lassiter, 452 U.S. at 31, 101 S.Ct. at 2161. We must determine whether a Utah paternity suit involves a potential deprivation of liberty. Like the Connecticut paternity actions at issue in Little, Utah paternity suits "have 'quasi-criminal' overtones." 452 U.S. at 10, 101 S.Ct. at 2207. Paternity actions brought on behalf of children receiving welfare benefits are really brought at the behest of the state, not just at the request of the mother. The actions are prosecuted by a county attorney or other government prosecutor. The state's involvement in establishing paternity and support obligations of indigent inmates indicates that the paternity actions differ from ordinary civil actions. Cf. Gideon v. Wainwright, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963) (presence of prosecutors one indication of need for defense lawyers); compare Lassiter, 452 U.S. at 29, 101 S.Ct. at 2160-61. Once the defendant is found to be the father an immediate support obligation arises, for both past and future support. Utah Code Ann. Secs. 78-45-3, 78-45a-1, 78-45a-3. Utah enforces support obligations with criminal sanctions that may lead to a prison term. See id. Sec. 76-7-201; see also id. Secs. 78-45a-5(1), 77-31-5, 77-31-9, 77-31-16. Nevertheless, the criminal nonsupport action is a separate proceeding subject to all of the substantive requirements and procedural safeguards required in all criminal cases. Paternity is an essential element of the crime of willful failure to support a child and must be proved beyond a reasonable doubt. See People v. Sorensen, 68 Cal.2d 280, 437 P.2d 495, 66 Cal.Rptr. 7 (1968). Because of the different degrees of proof in civil and criminal proceedings, the judgment in a civil paternity action would not be binding in the criminal case under the doctrines of res judicata or collateral estoppel, see United States v. Beery, 678 F.2d 856, 868 n. 10 (10th Cir.1982), and its admission as evidence presumably would be error prejudicial to the defendant. 1B J. Moore's Federal Practice p 0.418, at 551 (1983). It is improbable that an indigent would be prosecuted for criminal nonsupport of his child, because inability to pay support would be a defense to the charge. However, if the state did initiate such an action, the indigent defendant would be entitled to appointed counsel who could relitigate the paternity issue. Therefore, an indigent prosecuted in a paternity action, even with its quasi-criminal overtones, does not face the potential loss of liberty that weakens the presumption against appointed counsel.
 
 
 17
 Since defendants in paternity suits do not face deprivation of liberty, there is a presumption that they do not have a right to appointed counsel. We must balance that presumption against the weight of the Eldridge factors. Our conclusion parallels the Supreme Court's conclusion in Lassiter, 452 U.S. at 18, 101 S.Ct. at 2155. We can imagine complicated paternity suits in which the risks of error would be high enough that the presumption against the right to appointed counsel would be overcome. But we hold that the Due Process Clause does not require Utah to appoint counsel for all indigent prisoners who are defendants in paternity cases.
 
 
 18
 The appellants' equal protection argument is that Utah's prosecution of paternity suits against indigent inmates denies the inmates "fundamental rights to privacy in matters of family life and meaningful access to courts." They object that the state aids the mother but does not provide assistance to the one accused as father. As long as the appellants deny that they are the fathers of the children and seek to avoid responsibility for the children's support and welfare, they cannot complain on equal protection grounds of any interference with a family relationship. See Lehr v. Robertson, --- U.S. ----, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). We think the due process analysis above also answers the appellants' equal protection claim insofar as it relates to the imbalance of resources afforded the mother and the putative father.
 
 
 19
 AFFIRMED.
 
 
 
 *
 Honorable Howard C. Bratton, Chief Judge of the United States District Court for the District of New Mexico, sitting by designation
 
 
 [1]
 Utah participates in a federal program providing reimbursement of a large part of the cost of operating a state's child support plan on the condition that the state undertake to establish the paternity of children receiving aid. See 42 U.S.C. Secs. 655(a)(1), 654(4)
 
 
 [2]
 The appellees' brief asserts that two of the appellants have been paroled and that one of the parolees is not indigent. Those facts are not contained in the appellate record and so we treat all appellants as indigent prisoners
 
 
 [3]
 At oral argument counsel questioned whether uncounseled prisoners would know enough to demand their right to the blood tests. Given the statutory obligations cited above and the holding in this case, we doubt that this presents a real problem
 
 
 [4]
 The Utah statute provides:
 "If the court finds that the conclusions of all experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence. If the experts conclude that the blood tests show the possibility of the alleged father's paternity, admission of this evidence is within the discretion of the court, depending upon the infrequency of the blood type."
 Utah Code Ann. Sec. 78-45a-10.
 
 
 [5]
 For example, the Utah Supreme Court, after a lengthy and legally complex discussion of scientific evidence, established a set of standards to guide the discretion of trial courts in determining the admissibility of the results of HLA blood tests, one of the tests discussed in Little, in paternity actions. A trial court must consider:
 "(1) the correctness of the genetic principles underlying the test for determining paternity; (2) the accuracy and reliability of the methods utilized in application of the principle to determine paternity; (3) the effect of variables such as occur in persons of different nationalities or ethnic origins that would influence the accuracy of the test; (4) other factors that might tend to invalidate the test or significantly change the probability of accuracy; (5) establishing that the actual method employed and the particular test used in a given case were performed in accordance with proper procedures and with proper materials and equipment; and (6) the qualifications of the necessary witnesses."
 Phillips v. Jackson, 615 P.2d 1228, 1235 (Utah 1980) (footnote omitted). The court noted that "[p]ublished articles and books may also be used as evidence supporting points (1) and (2)." Id. at 1235 n. 8. It is readily apparent that uncounseled indigent inmates, whose access to books and articles is severely hampered, whose scientific knowledge is likely to be limited, and whose ability to discover and advocate a legal position on any of these six elements is likely to be minimal, are unlikely to be able to effectively argue for admission of favorable test results or against admission of unfavorable ones.