**Edward BLAKE, Respondent Below, Appellant,**

v.

**DIVISION OF CHILD SUPPORT ENFORCEMENT, ex rel. Brenda FOSTER, Petitioner Below, Appellee.**

Supreme Court of Delaware.

Submitted: March 24, 1987.
Decided: May 1, 1987.

---

2. The Superior Court trial judge was not the judge who presided at the call of the criminal     calendar.

J. Robert Hitchens, Georgetown, for appellant.

William F. Richardson, Deputy Atty. Gen., for appellee.

Before HORSEY, WALSH and HOLLAND, JJ.

HOLLAND, Justice.

On January 12, 1985, the Division of Child Support Enforcement (DCSE) filed a support petition against the appellant, Edward Blake,[1] seeking child support for Agnes Foster, born on May 13, 1982. Brenda Foster, the child's natural mother, had made an assignment of her support rights to the State of Delaware in return for certain child related benefits. As a preliminary matter, the Family Court held a mediation conference on April 11, 1984. Blake appeared at the mediation conference *pro se* and denied paternity. Also present at the mediation conference were a DCSE support officer and the Family Court mediator. The possibility of having medical testing done with respect to the paternity issue was discussed at the conference. The Family Court mediation conference concluded with Blake agreeing to submit to medical testing. A stipulation outlining the understanding of the parties was signed. When the results of the medical tests were received, the results showed a 99.97% probability that Blake was the father of Agnes Foster.

Blake continued to deny paternity despite the results of the medical tests. A trial was scheduled in the Family Court for April 7, 1986. Prior to trial, Blake retained a private attorney to represent him. The attorney filed a pre-trial motion to suppress the use of the medical test results as evidence at trial. The motion was based, in part, upon the fact that Blake was not represented by an attorney when he executed the agreement to submit to the medical tests to determine paternity. The motion to suppress was denied.

The trial took place as scheduled. The facts that were developed at trial revealed that Brenda Foster was married to Albert Foster on April 4, 1980. Brenda and Albert were divorced in June of 1983. Although Brenda and Albert were married at the time of Agne's conception and birth, Brenda testified that she and Albert were living separate and apart during that entire period of time. Brenda testified that she met Blake on August 15, 1981, in Ocean City, Maryland. Brenda testified that she and Blake engaged in sexual intercourse on that date. Blake denied having any sexual relationship with Brenda. Blake stated that during August 1981 he was at a Job Corps Camp in central Pennsylvania. The results of the medical tests were introduced as evidence.

The trial court weighed the testimony of the witnesses, the results of the medical tests, and observed that Agnes Foster had an "uncanny resemblance to the putative father." The Family Court found that Blake was the father of Agnes Foster. In this appeal, Blake raises various objections to the medical test results that were received into evidence and also alleges that there was insufficient evidence to support the Family Court's finding of paternity.

I

Blake contends that his rights were violated for the first time in a pretrial context when he agreed, prior to retaining an attorney[2], to submit to certain medical tests to possibly eliminate or establish paternity. Specifically, Blake alleges that he should have been advised of his right to counsel before he agreed to submit to the medical tests.

The right to counsel in this pretrial setting is most appropriately examined in the context of the role that medical tests now play in paternity cases. Medical tests and blood tests, in particular, have become an

---

1. Pseudonyms have been selected by the Court to identify the individuals in this case pursuant to Supreme Court Rule 7(c).

2. The defendant has never contended that he was indigent.

integral part of paternity proceedings. In this case, the positive test results became a sword for the mother but the tests are generally recognized as the best shield for the putative father who denies paternity.

The United States Supreme Court reviewed the question of blood tests extensively in *Little v. Streater*, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981). It quoted with approval the observation of one commentator that "there is now ... practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusive of paternity" *Id.* at 7, 101 S.Ct. at 2206, citing S. Schotkin, *Disputed Paternity Proceedings*, § 9.13 (1975). The *Little* court also noted that "the ability of blood grouping tests to exonerate innocent putative fathers was confirmed by a 1976 report developed jointly by the American Bar Association and the American Medical Association." *Little v. Streater*, 452 U.S. at 7-8, 101 S.Ct. at 2206. The *Little* court found that the most probative evidence that a defendant in a paternity suit might offer are the results of blood grouping tests that are favorable to him. The *Little* court concluded by holding that the United States Constitution guaranteed an indigent putative father access to blood grouping tests at the State's expense.

■ The entire thrust of the *Little* opinion was to guarantee access to the best *defense* in a paternity proceeding, i.e., blood grouping tests. The focus by courts has been on the right to have the tests done for the benefit of the putative father's defense not the right to the advice of counsel concerning the benefits of blood grouping tests. Even *indigent* putative fathers are only guaranteed the right to have the blood grouping tests done not the right to counsel *prior* to the testing. It has been held that given the availability and quality of blood grouping tests, there is no Constitutional guarantee to the appointment of counsel prior to the time the tests are given. *Nordgren v. Mitchell*, 716 F.2d 1335, 1337 (10th Cir.1983). We agree.

■ Independent of any Constitutional right to counsel, the Uniform Parentage Act provides that "[a]t the pretrial hearing and in further proceedings, any party *may* be represented by counsel." 13 *Del.C.* § 814(a). Although the issue of medical tests arose in a pretrial context, it was not a pretrial hearing. But, even at a "pretrial hearing and in further proceedings" there is neither a mandatory statutory right to counsel nor an obligation on the opposing party to inform the defendant of the right to seek counsel.

Blake had the continuing option of retaining counsel, but Blake had neither a mandatory statutory right nor a State or Federal Constitutionally guaranteed *right* to the assistance of counsel prior to agreeing to submit to medical tests to determine paternity. We find that Blake was not denied due process of law under the facts of this case. *See Matter of Carolyn S.S.*, Del.Supr., 498 A.2d 1095 (1984).

## II

Blake also claims that certain medical test results should not have been admitted into evidence because (1) the stipulation that he signed relating to the use of the test results was invalid; (2) the Human Leukocyte Antigen test (HLA) is an improper test for determining paternity; and (3) the State failed to lay a proper foundation for the admission of the test results as evidence. All of these claims are without merit.

■ In a paternity suit, the parties may voluntarily stipulate to the admissibility of test results in a court hearing pursuant to 13 *Del.C.* § 811(b). Blake signed such a stipulation. However, prior to trial, he filed a motion to vacate the terms and conditions of the stipulation. That motion was denied by the Family Court.

Blake's first basis for challenging the stipulation was his lack of legal representation. We have already concluded that Blake had the option of retaining an attorney but had no mandatory right of representation. Blake's second challenge to the stipulation focuses upon the Family Court mediation conference when it was executed. The evidence at the hearing estab-

lished that Blake was advised of the significance of the testing, and that he was not threatened or coerced into signing the stipulation. The only disputed point about the circumstances surrounding the execution of the stipulation relates to the information that was given to Blake about the effect of any refusal to submit to testing.

The Family Court held a full hearing on Blake's Motion to Suppress. After hearing testimony and considering the arguments of Blake's attorney, the Family Court concluded that Blake had made a knowing, intelligent, and voluntary decision to execute the stipulation. To the extent that the testimony of the witnesses was in conflict, the Family Court resolved the conflicting testimony contrary to Blake. This Court will not disturb conclusions of fact made by a trial judge that are supported by competent evidence. "When the determination of facts turns on a question of credibility and the acceptance or rejection of "live" testimony by the trial judge, his findings will be approved upon review." *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

The stipulation provided that the "results from the testing facility shall be admissible as evidence in Court without the presence of any representative of the testing facility." The record supports the Family Court's finding that Blake voluntarily agreed to be bound by the terms and conditions of the stipulation. Thus, the Family Court judge could properly rely on the stipulation as the basis for admitting into evidence the results of Blake's blood tests. *See* 13 *Del.C.* § 811(b).

Blake's next contention is that even if he is bound by the terms and conditions of the stipulation with respect to the admission of the results of the blood tests, the Human Leukocyte Antigen (HLA) testing of tissue and the admission of those results into evidence was beyond the scope of the stipulation. Paragraph 3 of the stipulation provides "in an effort to determine paternity, the parties will have HLA or ABO blood testing done ..." Paragraph 5 provides that if ABO blood testing is done and the results do not reach a 95% level of confidence, the respondent (Blake) will be permitted to have HLA testing done.

Blake argues that the terms of the stipulation made dissatisfaction with the ABO blood testing a prerequisite to the HLA testing. However, in reviewing the entire circumstances, the Family Court found that Blake elected to have the HLA test performed and signed what is termed a "client authorization" *in addition* to the stipulation. Specifically, the Family Court found

One more fact. I note that in addition to the stipulation that he signed initially, that he subsequently signed a client authorization. The client authorization specifically made reference, not to two types of blood tests, but only to the HLA blood test. And it's clear to me that while he authorized one of two blood tests, he was placed on notice that the HLA test, the more precise of the tests, the more detailed of the test would be administered.

Test results can be admitted into evidence by stipulation pursuant to 13 *Del.C.* § 811(b), however, the results of the tests that are submitted to voluntarily are also admissible under 13 *Del.C.* § 811(a). The record supports the Family Court's finding that Blake voluntarily submitted to the HLA testing and that those results were admissible, independent of the stipulation, pursuant to 13 *Del.C.* § 811(a).

The second prong of Blake's challenge to the admission of the HLA test is directed at the medical procedure itself. He questions the scientific reliability of the test and the qualifications of the person who performed the test. Under 13 *Del.C.* § 811, the results of medical testing may be admitted without testimony by an expert, if "[b]oth parties, through their attorneys, if represented, have had sufficient opportunity to submit written interrogatories to the expert concerning any relevant issues" 13 *Del.C.* § 811(a)(1), and if there is no timely request for personal testimony by the expert. 13 *Del.C.* § 810(f)(6).

The purpose of these provisions in the statute is to provide both parties with a full opportunity to examine the expert, regard-

less of any subsequent appearance or non-appearance of the expert as a witness in a related court proceeding. 13 *Del.C.* § 811(a)(1). Blake did not avail himself of the opportunity to propound interrogatories to the experts in order to challenge, among other things, the "expert's training and qualifications, laboratory procedures utilized, reliability of testing, identity of person's tested and the identity of other persons involved in the testing procedure or having access to the testing or the results." 13 *Del.C.* § 811(a)(1). To the extent that Blake now challenges the reliability of the test and the qualifications of the testing personnel, he is precluded from doing so since he had a chance to elicit that information through counsel by the procedures set out in 13 *Del.C.* § 811. Unless Blake invoked that process and elicited evidence sufficient to discredit the test results, the Family Court was required to admit the results into evidence. 13 *Del.C.* § 811(a).

■ Contrary to Blake's suggestion, the HLA test, in contrast to tests on red blood cell grouping, is highly probative and reliable evidence of the paternity. *See Cutchember v. Payne*, D.C.App. 466 A.2d 1240 (1983). HLA tests involve a large number of factors and provide much more conclusive proof of parentage, usually involving a ninety percent or greater probability of paternity. *See Terasaki, Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing*, 16 J.Fam.L. 543, 552–53 (1977–1978). The Family Court noted that the HLA test is generally considered to be a more precise test. In fact, the wording of the stipulation confirms this. The stipulation provides that it is the *respondent* (Blake) who had the right to elect to have the HLA testing performed if the confidence level of the ABO blood testing was in question. The Family Court ruled that "a more detailed test (HLA) was given and the results are deemed admissible in this hearing." We find that the results of the HLA test were properly admitted into evidence.

## III

■ Finally, Blake alleges that the record does not support the Family Court's conclusion that he was the child's father. Brenda Foster was married to Albert Foster on April 4, 1980, subsequently divorcing him in June 1983. Although she was still married to Albert at the time of the child's conception (August 1981) and birth (May 1982), Brenda was separated from Albert and lived with her parents. The Uniform Parentage Act creates the presumption that a man is the father of a child where he and the mother are married to each other and the child is born during that marriage. 13 *Del.C.* § 804(a)(1). However, under 13 *Del.C.* § 804(b), the presumption may be rebutted by clear and convincing evidence. That evidence may include the results of scientific tests and incidents of sexual intercourse between the mother and alleged father near the possible time of conception. 13 *Del.C.* § 810(f)(1) and (3).

■ Brenda testified that she met Blake at a bar in Ocean City, Maryland on August 15, 1981 and that the two of them engaged in sexual intercourse that night. Blake denied her allegations and stated that in August 1981, he had been at a Job Corps camp in central Pennsylvania. The testimony of the witnesses was in direct conflict. However, the results of the HLA test established a 99.97 percent probability that Blake is the natural father. The Family Court judge also noted "the uncanny resemblance of the child to the putative father." If there is sufficient evidence to support the findings of the trial judge, this Court, in the exercise of judicial restraint, must affirm. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671 (1972). We find sufficient evidence in the record to support the Family Court's finding that Blake is the natural father of Agnes Foster.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is

AFFIRMED.