**Adam M. ALLEN, Respondent Below, Appellant,**

v.

**DIVISION OF CHILD SUPPORT ENFORCEMENT, ex rel., Sandra WARE, Petitioner Below, Appellee.**

Supreme Court of Delaware.

Submitted: Feb. 20, 1990.

Decided: June 13, 1990.

Barbara D. Crowell and Thaddeus J. Weaver of Morris, James, Hitchens & Williams, Wilmington, for appellant.

Allison E. Hare and Martha F. Sackovich, Deputy Attys. Gen., of Dept. of Justice, Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY and HOLLAND, JJ.

HOLLAND, Justice:

██ This is an appeal from the Family Court of the State of Delaware, in and for New Castle County. The sole issue before this Court is the Family Court's decision not to appoint counsel to represent an indigent incarcerated putative father, in a paternity proceeding initiated by the State.[1] We hold that, under the circumstances of this case, as a matter of due process, the Family Court was required to appoint counsel for the putative father.

*Facts*

On December 2, 1985, the Division of Child Support Enforcement ("DCSE"), assignee of the right of the petitioner-appellee, Sandra Ware[2] (the "Mother"), filed a

---

1. *See* Annotation, *Right of Indigent Defendant in Paternity Suit to Have Assistance of Counsel at State Expense,* 4 A.L.R. 4th 363 (1981 & Supp. 1989).

2. Pursuant to Supreme Court Rule 7(c), pseudonyms have been used instead of the actual names of the parties.

civil petition against Adam M. Allen ("Allen"), alleging paternity and seeking child support for Adam Ware ("Adam"), born December 1, 1975. Allen and the Mother were never married. Allen has continuously denied that he is Adam's father.

On January 23, 1986, the Family Court ordered that medical tests for paternity be performed. Allen was already incarcerated for reasons which did not relate to the paternity proceeding. Due to apparent scheduling conflicts between the Department of Corrections and DCSE, blood was not drawn from Allen until February 29, 1988. The Mother and Adam had blood drawn on March 7, 1988. The record reveals that the Paternity Evaluation Report submitted in this case included the results of both blood grouping and human leukocyte antigen ("HLA") tests. *See Blake v. Division of Child Support. Enf.*, Del. Supr., 525 A.2d 154, 159 (1987). *See generally Plemel v. Walter*, 303 Or. 262, 735 P.2d 1209, 1211–15 (1987); *Moore v. McNamara*, 201 Conn. 16, 513 A.2d 660 (1986). The results of the medical tests for paternity failed to exclude Allen as Adam's biological father. In fact, the test results indicated a 99.55% probability of paternity.

On July 21, 1988, a hearing was held by a Master of the Family Court ("Master"). 10 *Del.C.* § 913. Testimony was presented by Allen and the Mother. The results of the blood grouping test were also admitted as evidence. The Master concluded that Allen's paternity had been established. The Master recommended that Allen be ordered to pay fifty dollars ($50.00) a month in child support, retroactive to December 2, 1985. Allen petitioned for a review *de novo* of the Master's finding and recommendation. *Id.* Allen also requested that an attorney be appointed to represent him.

A *de novo* hearing, before a judge of the Family Court, was scheduled for January 10, 1989. The Mother failed to attend the hearing on January 10, 1989. As a result of the Mother's absence, the proceedings were postponed. On January 10, 1989, Allen, who had appeared *pro se*, reiterated his request for appointed counsel, emphasizing the evidentiary complexities of the blood grouping test and the possibility of imprisonment for failure to pay child support. The Family Court held that Allen did not have a right to have counsel appointed to represent him, as a matter of due process. The Family Court also declined to exercise its discretionary prerogative to appoint counsel for Allen. *See* 13 *Del.C.* § 814(a).[3]

Another *de novo* hearing was scheduled on February 23, 1989. Both Allen and the Mother were present at this hearing. However, Allen's inappropriate conduct resulted in his removal from the courtroom. Thus, the February 23, 1989 paternity proceedings were conducted in Allen's absence. A Deputy Attorney General, representing DCSE, introduced evidence in support of the State's paternity petition.

The Family Court heard testimony from by the Mother. The Mother testified that she began engaging in sexual intercourse with Allen in 1973. She further stated that during the period of possible conception, she had intercourse with no one other than Allen. According to the Mother, when the child was born, Allen wanted the baby to be named Adam after him and she complied with that request. The Mother also testified that Allen held himself out to others as the father of the child and visited Adam until she forbid him from coming to her home. The Mother testified that it was not until she sought child support that Allen denied being Adam's father. The results of the blood grouping test were also admitted into evidence.

Based upon the evidence produced at the hearing, the Family Court found Allen to be the father of the child. Despite Allen's incarceration, the Family Court entered a support order in the amount of $100 per month retroactive to 1983, two years prior to the filing of the petition. *Compare Division of Child Support Enf. v. Barrows*, Del.Supr., 570 A.2d 1180 (1990) *and Ken-*

---

**3.** 13 *Del.C.* § 814(a) provides:

At the pretrial hearing and in further proceedings, any party may be represented by counsel. The Court may appoint counsel for a party who is indigent.

*ton v. Kenton,* Del.Supr., 571 A.2d 778 (1990). Arrears were calculated at $6,300 as of February 1, 1989.

Allen filed a notice of appeal on March 1, 1989. In this Court, Allen again alleged that he was indigent and requested the appointment of counsel. On July 18, 1989, this case was remanded to the Family Court with instructions to determine Allen's financial status. Supr.Ct.R. 19(c). On August 7, 1989, the Family Court found that Allen was indigent, and had been indigent throughout its proceedings. On August 30, 1989, this Court appointed counsel for Allen, for the limited purpose of representing his interest in this appeal. The Court acknowledges its gratitude to Barbara D. Crowell, Esquire, and Thaddeus J. Weaver, Esquire, of Morris, James, Hitchens & Williams, for their representation of Allen in this appeal, *pro bono publico.*

### Due Process Right to Counsel

Allen argues that, as a matter of due process, the Family Court was required to appoint an attorney to represent an incarcerated indigent putative father, in a paternity proceeding initiated by the State. The due process clause in the United States Constitution "imposes on the States the standards necessary to ensure that judicial proceedings are fundamentally fair." *Lassiter v. Department of Social Services,* 452 U.S. 18, 33, 101 S.Ct. 2153, 2163, 68 L.Ed.2d 640 (1981). "Due process, 'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Little v. Streater,* 452 U.S. 1, 5, 101 S.Ct. 2202, 2205, 68 L.Ed.2d 627 (1981) (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (concurring opinion)). "Rather, it is 'flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (quoting *Morris-*

*sey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). Its precise requirements depend upon the context in which the issue is raised. The United States Supreme Court has concluded that its precedents "speak with one voice about what 'fundamental fairness' has meant, when the Court has considered the right to appointed counsel." *Lassiter v. Department of Social Services,* 452 U.S. at 26–27, 101 S.Ct. at 2159. In *Lassiter,* the Court held that those precedents have established a "presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured." *Id.*

In considering whether an indigent litigant, who does not face the possibility of immediate incarceration, has successfully rebutted the foregoing presumption, the "other elements" which must be considered are: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Id.* at 27, 101 S.Ct. at 2159 (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).[4] A court must balance these elements against each other, and then set their net weight on the scales of justice against the presumption that there is a right to appointed counsel only where the indigent, if he or she is unsuccessful, may lose his or her personal freedom.

The issue presented in *Lassiter* was an indigent person's due process right to court-appointed counsel during a proceeding to terminate their parental rights. That same issue has been addressed by this Court. *Matter of Carolyn S.S.,* Del.Supr., 498 A.2d 1095 (1984). In doing so, this Court stated "[w]e find no sound reason for interpreting the due process language

---

**4.** [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional

or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

of the Delaware Constitution differently than the Due Process Clause of the Federal Constitution has been interpreted by the U.S. Supreme Court in *Lassiter.*" *Id.* at 1097–98. This Court found that "*Lassiter* stands for the rule that the [t]rial [j]udge, in the exercise of sound judicial discretion, is obligated to decide in the first instance whether due process requires the appointment of counsel for an indigent parent in a given case, subject to review on appeal." *Id.* at 1097.

In this case, the trial judge held that Allen did not have a right to appointed counsel, as a matter of due process. We must now review that decision, applying the two-step analysis set forth in *Lassiter. Matter of Carolyn S.S.,* Del.Supr., 498 A.2d 1095 (1984). First, we must determine whether the due process evaluation contained in *Eldridge,* requires the presence of counsel. Second, we must set the net weight of the *Eldridge* analysis against the presumption that there is a right to appointed counsel only when the indigent, if he is unsuccessful, may lose his personal freedom. *Lassiter v. Department of Social Services,* 452 U.S. at 27, 101 S.Ct. at 2159. *Accord Nordgren v. Mitchell,* 716 F.2d 1335, 1336 (10th Cir.1983).

The United States Supreme Court has not directly addressed the question of whether an indigent putative parent in a paternity action, initiated by the State, is entitled to court-appointed counsel. However, in a case decided simultaneously with *Lassiter,* the Court held that just as the termination of a parent-child relationship demands procedural fairness, so does its imposition. *Little v. Streater,* 452 U.S. at 13, 101 S.Ct. at 2209. In fact, *Little* is a unanimous decision which held that the due process rights of an indigent incarcerated putative father, in a paternity proceeding initiated by the State, must be analyzed in accordance with *Eldridge. Id.* at 6, 101 S.Ct. at 2205.

The Supreme Court's examination of Mr. Little's due process rights generally is particularly instructive for purposes of reviewing Allen's specific due process claim. Since Mr. Little was represented by a legal aid attorney, his right to appointed counsel was not at issue. However, in *Little,* the putative father, like Allen, was indigent and incarcerated. Similarly, in *Little,* the paternity proceeding had been initiated by the State, on behalf of the mother.

### Private Interests

The mother, the putative father, and the child are all directly affected emotionally and economically by the custodial arrangements which are made subsequent to an establishment of paternity or a finding of non-paternity. The putative father who denies paternity, but may become the non-custodial parent, has a pecuniary interest in avoiding a substantial child support obligation. *Id.* at 13, 101 S.Ct. at 2209. In addition to the emotional interest evoked following a finding of paternity, the father's liberty interest is threatened by the sanctions which are possible for noncompliance with an order to pay child support.[5] The mother has an emotional interest in the outcome of a paternity proceeding. She also has a financial interest in the amount of child support she will receive, or pay in the event she is the noncustodial parent. The child has an omnipresent interest in receiving emotional and financial support from both parents.

The other socio-economic implications which follow from a judicial determination of a parent-child relationship are also significant. Both parents are responsible for the health, education, and welfare of a minor child. An accurate family medical history can be critical in diagnosing and treating a child's physical illnesses. *Lavertue v. Niman,* 196 Conn. 403, 493 A.2d 213, 217 (1985). An adult child may become responsible for the support of one or both of his parents. 13 *Del.C.* § 503; *Lavertue v. Niman,* 493 A.2d at 217. A finding of paternity establishes rights of inheritance and the potential for receipt of life insurance,

---

**5.** A putative father may be incarcerated, if he is found to be in civil contempt for willfully violating a court order to pay child support or, if he is found to be in violation of the duty to provide support for a minor child. *Compare* 13 *Del.C.* § 516 (civil) *and* 13 *Del.C.* § 521 (criminal).

workman's compensation or Social Security benefits. These examples illustrate that the private interests implicated in a paternity proceeding are substantial.

■ The mother, the putative father, and the child, each have a compelling interest in an accurate determination of the parent-child relationship. *Little v. Streater*, 452 U.S. at 13, 101 S.Ct. at 2209. The United States Supreme Court frequently "has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection." *Id.* (citing *Stanley v. Illinois*, 405 U.S. 645, 651–652, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972)). We conclude that the private interests which are at stake in a paternity proceeding initiated by the State, weigh in favor of providing legal representation for an indigent putative father.

### Government Interests

■ The State has a legitimate interest in the fair and impartial adjudication of all disputes, including paternity proceedings. *Rivera v. Minnich*, 483 U.S. 574, 581 n. 8, 107 S.Ct. 3001, 3005 n. 8, 97 L.Ed.2d 473 (1987). That State interest is served, primarily, by an independent judiciary. *Id.* However, "[i]f as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interest, the State's [and the parents'] interest in the child's welfare may perhaps best be served by a hearing in which both [sides] are represented by counsel, without whom the contest of interests may become unwholesomely unequal." *Lassiter v. Department of Social Services*, 452 U.S. at 28, 101 S.Ct. at 2160. Thus, the State's interest in the appointment of counsel is theoretically not adverse to that of the putative father.

However, the State's interests diverge from those of the putative father insofar as the State wishes a paternity decision to be made as efficiently and economically as possible. *Id.* To promote those interests, it is desirable for the State to avoid both the expense of appointed counsel and the cost of the lengthened proceedings an attorney's presence may cause. *Id.* Consequently, the State does not, in fact, share the putative father's interest in the availability of appointed counsel. *Id.*

■ In reconciling the divergent public and private interests, we continue to be guided by *Little.* In *Little*, the Court emphasized that, unlike a common dispute between private parties, when the State's involvement in a paternity proceeding is considerable and manifest, it influences the inquiry into the duty to afford the putative father the constitutional right to due process. 452 U.S. at 9, 101 S.Ct. at 2207. In Allen's case, and in *Little*, since each child was a recipient of public assistance, the applicable law compelled the mother to assign all of her rights of child support to the State. 31 *Del. C.* § 504(a).[6] In Allen's

---

6. "In order to receive federal funding for aid to families with dependent children ("AFDC"), a state must require AFDC applicants "to cooperate with the State (i) in establishing the paternity of a child born out of wedlock ... and (ii) in obtaining support payments ... unless ... good cause [is shown]...." 42 U.S.C. § 602(a0(26)(B). Cooperation includes identifying the parent, appearing as a witness and providing information on penalty of perjury. 45 C.F.R. § 232.12 (1984); *see* General Statutes §§ 17–82b." *Lavertue v. Niman*, 493 A.2d at 216 n. 5. The standard form of Delaware assignment provides, in pertinent part:

1. I, the undersigned, understand that, under Section 504(a), Title 31, of the Delaware Code, all rights of support for any person applying for and/or receiving public assistance are automatically and immediately assigned to the State of Delaware until such time assistance is terminated.

2. I further understand that the assignment of support rights is in force for as long as any assistance unit member continues to receive public assistance and that assignment will continue after the termination of AFDC with respect to arrearages for the purpose of remembering past assistance paid.

3. I further understand that any support payments received by me for any person receiving public assistance belongs to the State of Delaware and must be given to the Division of Child Support Enforcement.

4. I further understand that I must cooperate in locating an absent parent (or other person with a duty to support), establishing paternity, and securing support, and that I must report and turn over any support payments I receive for any assistance unit member receiving public assistance.

case, and in *Little*, after receiving the assignment, the State referred the paternity suit to a Deputy Attorney General "for prosecution." *Little v. Streater*, 452 U.S. at 9, 101 S.Ct. at 2207. In Allen's case, and in *Little*, the State paid that attorney's fee and all costs of the litigation. *Id.* Finally, as in *Little*, the State will be the recipient of the monthly support payments to be made by Allen pursuant to the Family Court's judgment. *Id.* In *Little*, the Court found that "State action" had undeniably pervaded the paternity proceeding. *Id.* We are compelled to reach the same conclusion in Allen's case.

■ In *Little*, the Court also found that the nature of a paternity proceeding initiated by the State bears heavily on a putative father's due process claim. 452 U.S. at 10, 101 S.Ct. at 2207. In Delaware, such proceedings are characterized as "civil." 13 *Del.C.* § 810(a). However, because of the State's involvement, including the presence of a Deputy Attorney General representing the interests of both the State and the Mother, the paternity hearing takes on "quasi-criminal" overtones. *Little v. Streater*, 452 U.S. at 9, 101 S.Ct. at 2207. *Cf. Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963) (presence of prosecutors one indication of need for defense attorney). *See also Ridgway v. Baker*, 720 F.2d 1409, 1414 (5th Cir.1983); *Nordgren v. Mitchell*, 716 F.2d 1335, 1339 (10th Cir.1983). In such a proceeding, not only is the putative father opposed by the full resources of the State,

but if paternity is established, a subsequent failure to comply with the court's support order may be punishable by imprisonment. *Little v. Streater*, 452 U.S. at 9–10, 101 S.Ct. at 2207. *See* footnote 5, *supra.* The State has a legitimate interest in the welfare of a child born out of wedlock, who is receiving public assistance, by securing support for the child from those legally responsible through the judicial process. *Little v. Streater*, 452 U.S. at 14, 101 S.Ct. at 2209. That State interest is dramatically reinforced by federal financial incentives to establish paternity and to collect child support.[7] The Family Support Act of 1988 revises performance standards for states in establishing paternity and provides ninety percent federal matching funds for costs of genetic tests in paternity establishment cases. 42 U.S.C. § 654 (1983 & Supp.1990); 42 U.S.C. § 655(a)(1)(C) (Supp.1990).[8] The federal government also provides reimbursement to the State of Delaware for a large percentage of the other costs of operating its child support enforcement program, *including attorney fees*, on the condition that Delaware undertake to establish the paternity of children receiving public assistance. 45 C.F.R. §§ 304.20–304.21 (1989); *Little v. Streater*, 452 U.S. at 15, 101 S.Ct. at 2210. *See* 42 U.S.C. §§ 654–55 (1983 & Supp.1990); 45 C.F.R. §§ 201–307.40 (1989).

In *Little*, the Court recognized that, independent of the federal funding it received, the State has an interest in establishing paternity as economically as possible. 452

---

**7.** The Child Support Enforcement Program, Title IV–D of the Social Security Act (PL 93–647, Part B), requires each state to designate a single and separate agency (IV–D agency) to administer the child support enforcement program. 42 U.S.C. § 602(a). In Delaware, as in most states, this agency is found under the auspices of the state department of health and social services or similar welfare agency. The IV–D agency is responsible for submitting to the United States Office of Child Support Enforcement, Department of Health and Human Services ("OCSE"), a comprehensive statement for carrying out the requirements of the Title IV–D program ("State Plan"). *Id.*

Each State's Plan must be approved for the State to receive Federal funding for the operation of its child support enforcement program. 42 U.S.C. § 601. Federal Child Support Enforcement regulations govern the audit of State Plans and the imposition of financial penalties for failure to substantially comply with the Federal requirements. 42 U.S.C. § 602. *See* 45 C.F.R. §§ 233.10–233.145. OCSE is closely monitoring the States' progress toward full implementation and continued compliance with the federal laws and regulations relating to child support enforcement. U.S. Department of Health and Human Services, Office of Child Support Enforcement, *Thirteenth Annual Report to Congress*, Vol. I, p. 15.

**8.** *See* S.Rep. No. 377, 100th Cong., 2d Sess. 2, pt. 2, at 19–20 *and* H.R. Conf. Rep. No. 998, 100th Cong., 2d Sess. 2, at 91–97, *reprinted in* 1988 U.S. CODE CONG. & ADMIN. NEWS 2776, 2796–97, 2882–85.

U.S. at 14. Nevertheless, in ordering blood grouping tests to be provided to an indigent putative father, the Court held that although the State's pecuniary interest is legitimate " 'is hardly significant enough to overcome the private interests which are implicated in a paternity proceeding.' " *Little v. Streater*, 452 U.S. at 15–16, 101 S.Ct. at 2210 (quoting *Lassiter v. Department of Social Services*, 452 U.S. at 28, 101 S.Ct. at 2160). We reach the same conclusion with respect to the cost of appointed counsel for an indigent incarcerated putative father, who must defend his denial of paternity in an action initiated by an attorney on behalf of the State.

### Potential for Error

The final issue to be examined in the process of determining whether the presumption recognized in *Lassiter* has been rebutted by the factors set forth in *Eldridge*, is the risk that the procedures used will lead to an erroneous result. In *Little*, the Court noted that in a paternity proceeding, based primarily upon the self-interested testimony of the mother and putative father, there was considerable risk for an erroneous finding of paternity. 452 U.S. at 14, 101 S.Ct. at 2209. Therefore, in *Little*, the Court held that "because of its recognized capacity to definitely *exclude* a high percentage of falsely accused putative fathers, the availability of scientific blood test evidence clearly would be a valuable procedural safeguard in such cases." *Id.* (citations omitted). Accordingly, in *Little*, the Court held that to deny the "appellant blood grouping tests because of his lack of financial resources violated the due process guarantee of the Fourteenth Amendment." *Id.* at 17, 101 S.Ct. at 2211 (footnote omitted).

In this case, Allen was provided with the results of a blood grouping test at the State's expense. The State argues that due process does not also require Allen to subsequently be provided with an attorney. In support of its position, the State cites the acknowledgement in *Little* that blood grouping tests are universally accepted, as having great accuracy in *eliminating* a man as a father. 452 U.S. at 7, 101 S.Ct. at 2206; *Nordgren v. Mitchell*, 716 F.2d at 1337; J. Mayersak, *Methods of Defense in Contested Paternity Cases*, 35 Med. Trial Tech. Q, 439–49 (1989). The State also submits that, at the present time, there is not much debate that some paternity tests can *affirmatively* establish paternity, e.g., human leukocyte antigen ("HLA") tests. *See Blake v. Division of Child Support Enf.*, Del.Supr., 525 A.2d 154, 159 (1987).[9]

This Court has held that there is neither a constitutional nor a statutory right to appointed counsel *prior* to submitting to a blood grouping test. *Blake v. Division of Child Support Enf.*, 525 A.2d at 157.[10] In *Blake*, we noted the perceived accuracy of blood test results with regard to the *negation* of paternity. In making that observation, we relied upon the United States Supreme Court's statement in *Little* that "there is now ... practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test *exclusive* of paternity." 452 U.S. at 7, 101 S.Ct. at 2206 (citing S. Schotkin, *Disputed Paternity Proceedings*, § 9.13 (1975)), *quoted in, Blake v. Division of Child Support Enf.*, 525 A.2d at 157 (emphasis added). Given this level of accuracy in *eliminating* wrongfully accused parents in paternity proceedings, we held that appointment of counsel *prior* to taking the blood test would not enhance the accuracy of the results which were exclusive of paternity. *Blake v. Division of Child Support Enf.*, 525 A.2d at 157.

**9.** Subsequent to the *Little* decision, the Connecticut Supreme Court held that HLA testing is really tissue testing and the results of HLA tests are, therefore, not subject to the statutory restriction as blood tests, which are admissible only as proof of nonpaternity. *Moore v. McNamara*, 201 Conn. 16, 513 A.2d 660, 665–68 (1986).

**10.** *Accord Brank v. State*, Del. Supr., 528 A.2d 1185, 1189–90 (1987) (no due process right to counsel prior to submitting to a test which a suspect is required by law to take). A putative father in a paternity proceeding is obligated by law to submit to a blood test should one be ordered by the Family Court. 13 *Del.C.* §§ 809(b), 810(e), 810(f)(3).

We find that in addressing the potential for an erroneous finding of paternity, the utility of professional legal assistance is different *after* the results of a blood grouping test *do not negate paternity.* Where blood tests exclude the putative father, those results are "conclusive evidence of nonpaternity and the Court shall dismiss the action as to the alleged father." 13 *Del.C.* § 810(h). However, when a blood grouping test fails to exclude an indigent putative father, the test which he looked to as a defensive shield becomes the offensive sword which is used against him in the paternity proceeding. In *Little,* the Court noted that "[u]nlike other evidence that may be susceptible to varying interpretation or disparagement, blood test results, if obtained under proper conditions by qualified experts, are difficult to refute." 452 U.S. at 14, 101 S.Ct. at 2209.

The State's emphasis on the present state of the art in the accuracy of blood group, tissue, or any other medical testing to determine paternity is misplaced. We have no doubt that blood group, tissue, and other medical tests for paternity tests will become increasingly accurate, when properly conducted by qualified experts. However, the focus in *Little* and *Blake* was on the putative father's right to defend himself adequately. The Supreme Court of Nebraska has noted that given the complexity of blood tests, there is the possibility that an innocent man will be wrongly *included* as a possible biological father five to ten percent of the time. *Carroll v. Moore,* 228 Neb. 561, 423 N.W.2d 757, 761 (1988). If a blood grouping test is not exclusive, a putative father who continues to deny paternity must necessarily focus his defense upon a challenge to the non-exclusive test results.

The Court's decision in *Little* was influenced by the fact that, as a putative father in Connecticut, Mr. Little faced a unique evidentiary burden. 452 U.S. at 10, 101 S.Ct. at 2207. Similarly, Mr. Allen, as a putative father in Delaware, who has not been excluded from paternity following a blood grouping test, faces a significant evidentiary burden. The results of any court ordered blood tests are admissible in a Delaware in paternity proceeding, as follows:

Notwithstanding the Delaware Uniform Rules of Evidence, the *results of any medical testing* ordered under this chapter or any medical testing voluntarily submitted to by the parties *shall be admissible* in Court *as substantive evidence* of the *paternity or nonpaternity* of the alleged father. Such admission may be accomplished by filing in Family Court the test results of the expert authorized by the Court (hereafter "expert" for the purposes of this section), *provided that:*

(1) Both parties, *through their attorneys* if represented, have had sufficient opportunity to submit *written interrogatories to the expert concerning any relevant issues.* Such issues may include, but are not limited to: Expert's training and qualifications, laboratory procedures utilized, reliability of testing, identity of persons tested and the identity of other persons involved in the testing procedure or having access to the testing or the results. The purposes of the written interrogatories is to provide both parties with a full opportunity to examine the expert, regardless of any subsequent appearance or nonappearance by the expert as a witness in a related Court proceeding.

13 *Del.C.* § 811(a) (emphasis added).

The Delaware statutes, which set forth the circumstances under which the results of medical tests are admissible in paternity suits, expressly contemplates the possibility that those tests will be subjected to various challenges. *See* 13 *Del.C.* §§ 810, 811. Persons without legal training, whether indigent or not, are much less likely to be able to skillfully develop those challenges. Moreover, indigent inmates are likely to be those "with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation. That these factors may combine to overwhelm an uncounseled parent is evident from the findings some courts have made." *Lassiter v. Department of Social Services,* 452 U.S. at 30, 101 S.Ct. at 2161

(citations omitted); *Nordgren v. Mitchell*, 716 F.2d at 1337–38.

Being incarcerated can further complicate a putative father's dilemma. An inmate, due to the limited availability of library resources, may be "unable to perform even the most rudimentary legal or medical research for the purpose of discovery or trial . . . to which persons on the outside have at least theoretical access." *Nordgren v. Mitchell*, 716 F.2d at 1338. For obvious reasons, inmates are also foreclosed from performing personal factual investigation relevant to their case. As the Tenth Circuit has noted:

> [I]f the blood tests fail to rule out the accused man difficult legal, medical, and scientific questions may arise in the trial. The putative father may wish to challenge the testing procedures or the validity of the results. Such challenge can involve investigation of the procedures, presentation of expert testimony, cross-examination of the [S]tate's experts, and sophisticated legal arguments on admissibility. . . . A man accused as a father and not eliminated by blood tests may rely on an alibi defense or on a defense based on the existence of other potential fathers. These defenses may require pretrial investigation and discovery.

*Nordgren v. Mitchell*, 716 F.2d at 1337 (citation omitted). Consequently, in a paternity hearing following an inclusive blood test, a *pro se* indigent incarcerated putative father's own incapable challenge to the medical evidence, or failure to obtain witnesses could substantially impair the truth-finding function of the Family Court.[11]

In evaluating the risk that the procedures used to establish paternity might lead to an erroneous result it is also proper to again note the resources to which the indigent incarcerated putative father must respond. In cases, such as this one, where the mother has assigned her right to DCSE for enforcement, "government lawyers [often specializing in such cases], with all the resources of education, research, and investigation that normally pertain to their offices, advocate both the interests of the mother and the interests of the [S]tate." *Id.* at 1338 (comparing *Lassiter v. Department of Social Services*, 452 U.S. at 29, 101 S.Ct. at 2160). "This imbalance of litigative power makes the restrictions on the ability of indigent inmates to defend these actions even more consequential." *Id.* "[A]dequate cross-examination skills may, under our system of adversarial truth-seeking, become critical both to an adequate defense and to an accurate result." *Id.*

The accuracy of a finding of paternity is severely jeopardized when the results of the blood test are non-exclusive, and the indigent putative father is required to proceed without the assistance of counsel. *Id.* The use of the scientific results in the ensuing litigation, should the putative father continue to deny paternity, may contribute to the risk of error by increasing the complexity of the litigation.[12] *Id.* at 1337–38; *Lavertue v. Niman*, 493 A.2d at 218. *See* J. Mayersak, *Methods of Defense in Contested Paternity Cases*, 35 Med. Trial Tech. Q., 439–49 (1989). Lack of counsel under these circumstances brings the integrity of the fact finding process into question. We are convinced that, in cases that proceed following a non-exclusive blood test result, providing counsel to an indigent incarcerated putative father, would help ensure the accuracy of the paternity determination. *See Kammer v.*

---

**11.** It has been suggested, for example, that the existence of one or more potential fathers, in addition to the putative father, can seriously undermine the premise upon which the blood test results rest. Mayersak, *Methods of Defense in Contested Paternity Cases*, 35 Med. Trial Tech. Q., 439–49 (1989).

**12.** *See generally Kofford v. Flora*, 744 P.2d 1343, 1348–1350 (Utah 1987); *McCormick on Evidence*, §§ 211–12 (E. Cleary ed. 1984); D.H. Kaye, R. Hanwisher, *Admissibility of Genetic*

*Testing in Paternity Litigation: A Survey of State Statutes*, 22 Fam.Law.Q. 109 (1988) (citing Kolko, *Admissibility of HLA test results to Determine Paternity*, 9 Fam.L.Rep. (BNA) 4009 (Feb. 15, 1983); Annotation, *Admissibility and Weight of Blood–Grouping Tests in Disputed Paternity Cases*, 43 A.L.R. 4th 579 (1986 & Supp.1989); Annotation, *Admissibility, Weight and Sufficiency of HLA Tissue Typing Tests in Paternity Cases*, 37 A.L.R. 4th 167 (1985 & Supp.1989).

*Young,* 73 Md.App. 565, 535 A.2d 936 (1988); *State v. Thompson,* 503 A.2d 689 (Me.1986).

### Due Process Requires Appointed Counsel

Our analysis of the three *Eldridge* factors weighs in favor of providing counsel for an indigent incarcerated putative father, in paternity cases, initiated by the State, that proceed after the completion of medical testing which is non-exclusive. *Nordgren v. Mitchell,* 716 F.2d at 1339. The dispositive question, which must now be addressed, is whether the three *Eldridge* factors, when cumulatively balanced against the presumption which was recognized in *Lassiter,* lead to the conclusion that due process requires the appointment of counsel. *Lassiter v. Department of Social Services,* 452 U.S. at 31, 101 S.Ct. at 2161.

In weighing the competing considerations, we continue to be guided by the *Little* decision. In *Little,* the Court stated that the putative father's due process claim must be examined in the context of the unique quality of blood grouping tests as a source of evidence, the State's prominent role in the litigation, and the character of paternity actions. 452 U.S. at 6, 101 S.Ct. at 2205. In *Little,* the Court found that because the putative father "has no choice of an alternative forum and his interests, as well as those of the child, are constitutionally significant," paternity proceedings are comparable to the situation presented in *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). 452 U.S. at 16 n. 12, 101 S.Ct. at 2210 n. 12.

In *Boddie,* the Court held that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut,* 401 U.S. at 377, 91 S.Ct. at 785, *quoted in, Little v. Streater,* 452 U.S. at 5, 101 S.Ct. at 2205. *Accord Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *Mullane v.*

*Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). In *Little,* a meaningful opportunity to be heard was determined to be access to a blood grouping test which, if exclusive, could "speak" in opposition to a charge of paternity. 452 U.S. at 16, 101 S.Ct. at 2210. When a medical test to determine paternity is not exclusive, in our adversarial system of justice, a "meaningful opportunity to be heard" is the assistance of counsel, "without whom the contest of interests may become unwholesomely unequal." *Lassiter v. Department of Social Services,* 452 U.S. at 28, 101 S.Ct. at 2160.

The record reflects that, in Allen's case, as in *Little,* the aggregate net weight of the *Eldridge* factors is greater than the presumption recognized in *Lassiter.* Without the assistance of counsel, an indigent incarcerated putative father, who faces the State via its attorney as an adversary in a paternity case, and who must overcome the evidentiary burden of not being excluded by a medical test, is not afforded "a meaningful opportunity to be heard." We hold that, in the specific circumstances presented by this case, Allen's due process right to fundamental fairness in a judicial proceeding required that an attorney be appointed to represent him. *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981); *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *Matter of Carolyn S.S.,* Del. Supr., 498 A.2d 1095 (1984); U.S. Const. amend. XIV; Del. Const. art. I §§ 7 and 9.

### Conclusion

The decision of the Family Court is REVERSED. This matter is remanded for proceedings consistent with this opinion.