Pittsfield District Court
No. 90-382

THE STATE OF NEW HAMPSHIRE

v.

VINCENT C. MARTINA

December 6, 1991

*John P. Arnold,* attorney general (*Peter G. Beeson,* assistant attorney general, on the brief and orally), for the State.

*Law Offices of Andrew P. McEvoy,* .of Concord (*Andrew P. McEvoy* on the brief and orally), for the defendant.

*Shaheen, Capiello, Stein & Gordon,* of Concord (*Stephen M. Gordon & a.* on the brief, and *Mr. Gordon* orally), for the New Hampshire Bar Association, as *amicus curiae.*

HORTON, J. This case presents the primary question whether a district court judge possesses the authority to sanction misconduct which occurs in his presence through direct criminal contempt, and also addresses a number of related procedural issues. For the reasons stated herein, we hold that a district court judge does have such authority, and vacate and remand so that a hearing may be held after the contemnor has received proper notice.

On August 16, 1990, the matter of *State v. Theresa Sestito* was scheduled for trial in the Pittsfield District Court. The contemnor, who was counsel for Ms. Sestito, did not appear that afternoon on behalf of his client, who had been charged with issuing a bad check, RSA 638:4. Upon learning that the parties hoped to resolve this matter by negotiated plea, an attempt was made to secure the contemnor's presence at trial. This effort was not successful. The District Court (*Lind,* J.) then appointed new counsel, and accepted a negotiated plea proposed by the parties. On that same day, the contemnor was instructed by telephone to appear in court on August 23, 1990, to explain his absence from the trial.

On August 23, 1990, the contemnor appeared as directed before Judge Lind, at which time a hearing was held. The court proceeded to question the contemnor regarding his non-appearance on August 16th. The contemnor stated that he had had "an agreement with [police prosecutor] Whitmarsh that my client could attend on her own, with my instructions on how to proceed." The court, apparently troubled that the contemnor had entered an appearance on his client's

behalf, yet failed to appear, did not accept this explanation and continued to inquire. Following a short exchange, the contemnor stated that "[m]y reasons for not showing up were personal reasons. I am trying to make a living. This was a pro bono matter and I felt that my client was not unintelligent. She was fully informed. I simply entered an appearance to expedite it." Again, the court did not accept this explanation and questioned whether the contemnor's conduct was consistent with his professional obligation to provide competent and diligent representation. The contemnor informed the court that if the proposed plea had not been accepted, "[w]e, then, would have proceeded to a fair jurisdiction, a fair forum, where she would have been exonerated of this ridiculous charge." Shortly thereafter, the following exchange took place:

"Judge Lind: All right, I don't understand at all, your basis for not showing up, sir, and I'm going to refer this matter to the Professional Conduct Committee. . . .

Mr. Martina: Thank you. I. . . . .

Judge Lind: . . . . and whether there's going to be charges brought or not, I'll leave up to the County Attorney, sir.

Mr. Martina: Thank you, and I should advise the court I intend to bring you to the Judicial Conduct Committee. I think your actions before this Bench were quite frankly ignominious.

Judge Lind: All right, sir, I find you in direct contempt of court. The sentence . . . do you have anything to say before I impose a sentence, sir?

Mr. Martina: I have nothing more to say to this Court.

Judge Lind: All right, do you understand that you're being found in direct criminal contempt of this Court, sir?

Mr. Martina: Whatever you say.

Judge Lind: All right, the punishment sir, is a fine of five hundred dollars and fifteen days in the House of Correction, stand committed. Bailiff, he's in your custody."

The court issued a written order that same day which further noted that the contemnor was "belligerent, caustic, and contentious

from the outset" and that "the Court had to ask Mr. Martina to stand when he was addressing the Court." The court further stated that the contemnor's "demeanor, such as his facial expressions, his posturing and the tone of his voice, was openly disrespectful and contumacious," and that his conduct was a "a conscious and deliberate attempt to intimidate and deride the court in the presence of the parties and witnesses waiting for their scheduled trials."

On August 24th, the contemnor filed a motion to reconsider, an alternative motion for *ex parte* temporary stay, and a request for immediate hearing and for other further relief, in the Pittsfield District Court. On that same day, the contemnor filed a petition for writ of habeas corpus with this Court. We stayed the commitment order, the contemnor having already served one day of incarceration, and set an August 31, 1990, deadline for preparation of the transcript of the hearing.

On September 6, 1990, we denied the pending petition for writ of habeas corpus, set a deadline for filing a notice of appeal, and continued the stay of the commitment order. On September 12th the contemnor filed a motion with the district court requesting a ruling on his previously filed motion for reconsideration, to which the State responded, through the office of the attorney general, on September 19th. Further pleadings were filed in this Court, seeking a remand, and on October 2, 1990, we remanded to the district court with instructions to rule upon the pending motion for reconsideration. That motion was denied on October 31st, and this appeal was then filed on November 30th. An amicus brief has been filed on the contemnor's behalf by the New Hampshire Bar Association ("the Bar").

The contemnor makes three arguments on appeal: (1) that the Pittsfield District Court did not have jurisdiction over his alleged misconduct; (2) that his rights to fundamental due process were violated; and (3) finally, that if the court did, in fact, have jurisdiction, and his due process rights were not violated, the record does not support a finding of direct criminal contempt. The Bar makes the same three arguments and also contends that the contempt hearing should have been held before a different judge and at a later date. The Bar also sets forth a multi-step process which it suggests this Court adopt to govern contempt proceedings.

The State responds to these arguments by contending, first, that a district court does have the authority to sanction misconduct which occurs in its presence through direct criminal contempt; second, that the contemnor's conduct did constitute criminal contempt; third, that the district court properly exercised its discretion in employing

summary contempt; fourth, that the district court did not become so personally involved in the hearing as to warrant its disqualification from the case; and fifth, that this matter should be remanded so as to allow the initiation of contempt proceedings with proper notice to the contemnor.

We will first address the issue of jurisdiction, then review the procedure which was utilized by the district court and, finally, examine the merits of the finding of contempt. In so doing, we will address the various contentions raised by the parties.

The contemnor argues that the district court, and all courts for that matter, lack subject matter jurisdiction over criminal contempt in light of the enactment of RSA 625:6 (abrogating all common law crimes) and, in this case, lacked both personal and subject matter jurisdiction because there was no pending case or controversy. The contemnor also argues that the district court has no powers of criminal contempt because it is a court of limited jurisdiction, relying on the legislature for its jurisdiction. *See State v. Moquin*, 105 N.H. 9, 12–14, 191 A.2d 541, 544–45 (1963) (Kenison, C.J., and Duncan, J., dissenting). The contemnor urges that we overrule our prior holding in *Benton v. Dist. Ct.*, 111 N.H. 64, 65, 274 A.2d 876, 878 (1971), that the district court has the authority to sentence for contempt.

RSA 625:6 provides that "[n]o conduct or omission constitutes an offense unless it is a crime or violation under this code or another statute." The contemnor maintains that this language has abrogated the authority of the courts to utilize the power of criminal contempt. We have, however, long recognized and repeatedly reaffirmed the inherent criminal contempt authority vested in New Hampshire courts of all levels. *See State v. Matthews*, 37 N.H. 450, 453 (1859) (the authority to punish for contempt is inherent in all courts of law or equity independent of statutory provisions); *State v. Towle*, 42 N.H. 540, 544–45 (1861) (power of magistrate or justice of the peace to punish for contempt); *Opinion of the Justices*, 86 N.H. 597, 602, 166 A. 640, 646 (1933) (power of contempt is essential attribute of courts of general jurisdiction); *Moquin, supra* at 10–11, 191 A.2d at 543–44 (municipal court); *Benton, supra* at 65, 274 A.2d at 878 (authority of district court to sentence for contempt as extensive as that of municipal court); *Kersevich v. Jaffrey Dist. Ct.*, 114 N.H. 790, 791, 330 A.2d 446, 447 (1974) (authority of district court to punish for contempt "is required to prevent acts or conduct which would obstruct or interfere with the orderly administration of justice"); *Town of Nottingham v. Cedar Waters, Inc.*, 118 N.H. 282, 385 A.2d 851 (1978) (authority of superior court); *State v. LaFrance*, 124 N.H. 171,

179–80, 471 A.2d 340, 344–45 (1983) (it is necessary that the judiciary be permitted to control its own proceedings). "It is not a power granted by the legislature, but is a necessary incident to the exercise of judicial power inherent in the functioning of the court system." *LaFrance, supra* at 179, 471 A.2d at 344. It is the "duty and responsibility of courts to be alert to protect the judicial processes from being brought into disrepute and to act vigorously when confronted with acts or conduct which tend to obstruct or interfere with the due and orderly administration of justice." *Moquin, supra* at 11, 191 A.2d at 543. It is also important to note that in 1933, the legislature proposed legislation limiting the power of courts to punish for contempt. *See Opinion of the Justices, supra* at 601, 166 A. at 646. This court advised that such legislation would violate the principle of separation of powers. *Id.* at 601–02, 166 A. at 646; *see also* 17 N.H.B.J. 13, 14 (1975).

◼ In light of the above-stated language, it is apparent that RSA 625:6 does not in any way abolish the common law crime of criminal contempt, as it is not founded upon, nor does its rely upon, legislative authority. Although characterized as a crime, criminal contempt should properly be viewed as a non-statutory offense. *See Town of Nottingham, supra* at 285, 385 A.2d at 853 (contempt is a common law offense); *see also* R. MCNAMARA, 1 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 2. We accordingly reject the contemnor's request that we overturn *Benton supra*.

◼ The contemnor would have us revisit *Moquin supra*, and adopt the position of the dissenters, limiting this inherent power of contempt to courts of general jurisdiction. We decline to do so. Not only is the power to punish for criminal contempt inherent in *all* courts, but it is of particular importance in the district courts, "before which it is probable that more people appear than before all other courts combined. . . ." *Moquin supra*. In *Kersevich*, although the plaintiffs therein did not challenge the district court's power to punish for direct criminal contempt, this court noted that such authority is necessary "to prevent acts or conduct which would obstruct or interfere with the orderly administration of justice. . . ." *Kersevich*, 114 N.H. at 791, 330 A.2d at 447. This power is not dependent upon legislative authority, *see Opinion of the Justices supra*, and clearly is vested in the district court.

◼ In the seventeen years that have passed since Kersevich was decided, it is readily apparent that the district courts, like the court

system itself, process a steadily increasing number of cases. To find that district courts do not possess authority to punish for criminal contempt would not only ignore precedent dating back to 1859, but effectively tie the hands of those entrusted to ensure that justice is administered both fairly and efficiently. Here, the Pittsfield District Court properly invoked this power. The alleged contemptuous conduct took place in open court, during regular court proceedings, at a hearing on a question of judicial procedure. It was a natural outgrowth of *State v. Sestito* and was properly of concern to the court. We affirm that the court had jurisdiction over the subject matter of the inquiry and over the person of the contemnor. The conclusion that there was jurisdiction over the contempt proceedings flows from this finding.

We next address the procedure utilized by the district court in making its contempt finding. The contemnor argues that his fundamental rights to due process, as protected by the first, fifth, sixth, and eighth amendments to the United States Constitution, were violated by the Pittsfield District Court. The contemnor does not explain the manner in which each enumerated right was violated, although he does set forth a number of arguments. Specifically, he contends that his procedural due process rights were violated because the district court did not inform him of his alleged contemptuous conduct, nor did it hold a hearing on the record. The contemnor also contends that the court's failure to hold a hearing on his post-contempt motions constituted a fundamental denial of due process. The Bar makes essentially the same arguments: namely, that the court's finding of summary criminal contempt and its imposition of a sentence violated part I, articles 15 and 35 of the New Hampshire Constitution and the fourteenth amendment to the Federal Constitution. It suggests that further notice to the contemnor should be required; *i.e.*, notice that gives the contemnor fair warning that he is venturing into the area of contempt. The State contends that the use of summary contempt procedure was proper and that a fair warning was not necessary in this instance, but agrees that the contemnor did not receive proper oral notification of the charges and concedes that this deprivation did not constitute harmless error.

▮▮ We will first address the propriety of the use of summary contempt procedure by the district court. The contemnor does not appear to raise this issue specifically, but does contend that his fundamental due process rights were violated because he did not receive notice of his alleged contemptuous behavior. It is not readily appar-

ent whether this argument challenges the use of summary contempt or, rather, the lack of oral notice of charges. The Bar has suggested that without fair warning, contempt is an inappropriate sanction. In *Town of Nottingham* we established that:

> "The summary contempt power should be used only when the contemnor's conduct in the presence of the court is openly threatening the orderly procedure of the court or publicly defying its authority. The contemptuous behavior must constitute a threat that immediately imperils the administration of justice."

118 N.H. at 285–86, 385 A.2d at 854 (citation omitted). This holding eventually led, at the court's suggestion, to the adoption of Superior Court Rule 95(a). The effect of summary procedure is to dispense with the formal requisites of instituting a criminal proceeding such that it is no longer necessary to engage in "all that goes with a conventional court trial." *Id.* at 285, 385 A.2d at 854 (citing *Sacher v. United States*, 343 U.S. 1 (1952)). The fact that criminal contempt "occurs as a result of the defendant's interference with the court's process or dignity[,]" *Duval v. Duval*, 114 N.H. at 425, 322 A.2d at 3, dictates that the trial court's decision to utilize summary procedure should not be overturned unless an abuse of discretion is shown. *See United States v. Wilson*, 421 U.S. 309, 319 (1975); *In re Gustafson*, 650 F.2d 1017, 1022 (9th Cir. 1981).

In the present case, a review of the record supports the court's decision to utilize summary procedure. In its order of August 23, 1990, the court found that:

> "[Contemnor's] conduct in the presence of the court was openly threatening to the procedures of the court and publicly [defiant of] its authority ... [such] that his behavior was a conscious and deliberate attempt to intimidate and deride the court in the presence of the parties and witnesses waiting for their scheduled trials. The constancy and degree of [contemnor's] contemptuous conduct imperiled the administration of justice."

This finding, when read in conjunction with the transcript of the hearing of August 23, 1990, amply supports the court's decision to utilize summary procedure. It should not be overlooked that the contemnor is an officer of the court, an experienced attorney, familiar with the requirements of court decorum and the effect that breaches of decorum have on the administration of justice. No fair warning was required in this case.

We next turn our attention to the issue of notice. As previously stated, the contemnor argues that he did not receive notice, prior to the finding of contempt, that the court considered his behavior contemptuous, and that a hearing was not held. In order to utilize summary procedure,

> "the court must give the contemnor oral notice of the conduct observed thought to constitute contempt. The contemnor must be given an opportunity to speak in his defense. If the contemnor is found guilty, the court may then pronounce sentence. The court must prepare, sign, and enter on the record an order of contempt, reciting the facts the court observed and which gave rise to the contempt."

*Town of Nottingham*, 118 N.H. at 286, 385 A.2d at 854 (citing *State v. Linsky*, 117 N.H. 866, 379 A.2d 813 (1977)). In the present case, it is apparent that the district court failed to comply with the oral notice requirement in that it did not provide the contemnor with notice of the charges and, therefore, a meaningful opportunity to speak in his defense before finding him guilty of criminal contempt. *But see Matter of Daniels*, 570 A.2d 416, 426 (N.J.) (fact that defendant was found in contempt before being given opportunity to speak did not abridge right to be heard, because he was given the opportunity to defend himself), *cert. denied*, 111 S. Ct. 371 (1990). The record reflects that the court found the contemnor guilty of direct criminal contempt, without articulating the basis for its finding, and then asked if the contemnor had anything to say before sentence was pronounced. It is therefore arguable that the contemnor may have surmised that the contempt finding was based solely upon his use of the word "ignominious", although the record reflects that the finding was premised upon his entire course of conduct throughout the hearing. If proper notice had been provided and a meaningful opportunity to be heard afforded, the outcome might well have been different. The "right of allocution . . . must be provided in [ ] summary criminal contempt" cases since "formal charges, right to counsel, and other procedural matters [are] not . . . applicable because of the immediacy of the conduct and the need for prompt action by the judge before whom the contempt occurred." *Town of Nottingham, supra* at 286, 385 A.2d at 854–55 (citing FED. R. CRIM. P. 42(a)).

In light of the fact that the record does not contain an informed response of the contemnor, we are unable to determine whether the facts of this case are sufficient to support a finding of direct criminal contempt. Nor will we speculate on the charges that may be formu-

lated from the record before us. The issue before us can be no more than whether probable cause exists to continue with the contempt proceedings. Should the record be bereft of any reasonable basis for a finding of contempt, we would call a halt, but the record supports continuing.

■  The State is required to prove the elements of direct criminal contempt beyond a reasonable doubt. *Linsky*, 117 N.H. 866, 872, 379 A.2d 813, 817 (1977).

> "A criminal contempt action . . . occurs as a result of a defendant's interference with the court's process or dignity. This interference is characterized as a criminal or public wrong, and the imposition of a fine or imprisonment is punitive rather than remedial."

*Duval v. Duval*, 114 N.H. 422, 425, 322 A.2d 1, 3 (1974) (citations omitted).

Here, the record reflects, contrary to the contemnor's assertion, that he was not cited for criminal contempt solely for his use of the word "ignominious" in expressing his view of the court's conduct. The contemnor was cited, rather, for his behavior throughout the hearing. His conduct took place in the courtroom, in the presence of court personnel and individuals involved in other litigation. The contemnor refused to explain his absence from the hearing until he was apprised of what charge or complaint was being leveled against him. Further, he made comments regarding the fairness of the forum, and stated that the charge against his client was ridiculous. The record also reflects that he repeatedly interrupted the court during the hearing. These facts, otherwise unexplained, would support a finding that the contemnor did, in fact, "[interfere] with the court's process or dignity." *Duval, supra* at 425, 322 A.2d at 3.

■  The contemnor also argues that because the court became personally involved in their verbal exchange, and viewed itself as being personally attacked, a *per se* rule of judicial disqualification should be applied. In support thereof, he directs our attention to both State, *see, e.g., State v. Aubert*, 118 N.H. 739, 393 A.2d 567 (1978), and federal case law, *see Taylor v. Hayes*, 418 U.S. 488 (1974). Part I, article 35 of the State Constitution provides in pertinent part that "[i]t is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." In *State v. Fennelly*, 123 N.H. 378, 461 A.2d 1090 (1983), we explained that

> "[a] per se rule of disqualification due to the probability of unfairness applies when the trier [of fact] has pecuniary in-

terests in the outcome, when the trier [of fact] has become personally embroiled in criticism from a party before him, or when he has heard evidence in secret at a prior proceeding, or when he is related to a party."

*Id.* at 384, 461 A.2d at 1097 (1983) (quoting *Plaistow Bank & Trust Co. v. Webster*, 121 N.H. 751, 754, 433 A.2d 1332, 1334 (1981)). In this case, the question is whether the court became "personally embroiled in criticism" from the contemnor. The test is that "[t]here must exist bias, or such likelihood of bias, or an appearance of bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Linsky*, 117 N.H. at 882, 379 A.2d at 823–24. *See generally*, Annotation, *Disqualification of Judge in State Proceedings to Punish Contempt Against or Involving Himself in Open Court and in His Actual Presence*, 37 A.L.R. 4th 1004 (1985). Here, the record does not reflect a factual scenario which suggests that the court should be recused. The hearing in this case lasted approximately fifteen minutes. There is no indication that the court acted in anger or became personally embroiled in the exchange between the parties; rather, this situation arose due to the contemnor's attempt to explain what he believed to be valid general reasons for his absence, which the court refused to accept.

As previously discussed, the record supports the conclusion that there was probable cause that a finding of direct criminal contempt could be made; therefore, we vacate the contempt finding of August 23, 1990, and remand this matter to the district court in order that a new hearing consistent with the procedure set forth in *Town of Nottingham* may be noticed and held. It is thus not necessary to address the contemnor's argument that his due process rights were violated because the district court did not hold a hearing on his motion for reconsideration and other motions that were pending at that time.

The contemnor also raised one further argument in his brief that was not raised in his notice of appeal: namely, that the court's failure to actually issue the order of August 23, 1990, constitutes reversible error. We will therefore not address this contention. SUP. CT. R. 16(3)(b).

*Vacated and remanded.*

All concurred.