Michael DISABATINO, Respondent Below, Appellant,

v.

Mary Anne SALICETE, Petitioner Below, Appellee.

Nos. 462, 1994, 23, 1995.

Supreme Court of Delaware.

Submitted: Dec. 12, 1995.
Decided: Jan. 16, 1996.

Thomas S. Neuberger (argued), Wilmington, and Gary L. Smith, Newark, for appellant.

Daniel F. Kelleher, Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, for appellee.

Michael J. Rich, State Solicitor, Peter S. Feliceangeli and W. Michael Tupman, Deputy Attorney General, Wilmington, amicus curiae, for Delaware Dept. of Justice.

Chandlee Johnson Kuhn, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, amicus curiae, for Delaware Family Law Section of the Delaware State Bar Ass'n.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ. (constituting the Court en Banc).

HOLLAND, Justice:

The parties were divorced on July 1, 1993. Thereafter, the appellee, Mary Anne Salicete ("Salicete") filed a series of petitions for a Rule to Show Cause. Each petition alleged that the appellant, Michael DiSabatino ("DiSabatino"), had violated prior orders of the Family Court.

The Family Court conducted hearings, made findings of fact, and entered dispositions on several of the petitions. The first order at issue in this appeal was entered on November 16, 1994. It imposed sanctions upon DiSabatino which: placed him on curfew; restricted his driver's license; and ordered him to pay Salicete the sum of $18,000 by December 1, 1994. DiSabatino filed a notice of appeal from that judgment on November 30, 1994, but did not seek to have it stayed.

On December 27, 1994, the Family Court conducted a hearing and concluded that DiSabatino was in contempt of its November 16, 1994 judgment. The sanctions imposed included DiSabatino's commitment to the Department of Adult Corrections as of December 28, 1994 at 12:00 noon. DiSabatino was to be incarcerated until such time as he purged himself of the contempt finding, by paying to Salicete the sum of $18,000 with interest at 8% from December 1, 1994. DiSabatino filed a notice of appeal from that judgment on January 25, 1995.

DiSabatino's two appeals were consolidated.[1] DiSabatino contends that each of the proceedings and judgments in the Family Court were for "serious" criminal contempt. The undisputed record reflects that DiSabatino was denied the full panoply of rights which are afforded to an accused person, *inter alia*, the right to trial by jury. Thus, DiSabatino argues the adjudications of contempt and the sanctions imposed by the Family Court must be reversed.

This Court has concluded that the proceedings and sanctions in the Family Court were criminal in nature and "serious." Therefore, DiSabatino was entitled to invoke all the

---

1. On December 28, 1994, DiSabatino filed an emergency motion for review. This Court entered an order dated December 28, 1994 granting a stay with conditions, which order was subsequently revised on December 30, 1994.

protections of the constitutional rights that are guaranteed to a defendant in a criminal proceeding, including the right to a trial by jury. Consequently, the judgments of the Family Court are reversed.

### Facts

On November 23, 1993, Salicete filed a petition for a Rule to Show Cause. The petition alleged that DiSabatino had violated the automatic restraining order, which had been entered pursuant to 13 *Del.C.* § 1509(a).[2] The Family Court conducted a hearing on December 14, 1993. It concluded that DiSabatino had violated the restraining order during the period of November 18–20, 1993, by: approaching Salicete at a tavern; pouring a glass of wine over her head; addressing her with profanity; and driving to her house at 3:30 a.m., where he insulted her from his parked vehicle.

As sanctions for the violation, the Family Court assessed DiSabatino $1,500. It ordered the assessment to be paid to Salicete from DiSabatino's share of the marital estate at the time of the property division hearing. The Family Court advised DiSabatino that the monetary assessment would be doubled for any future violations. DiSabatino was also ordered to pay Salicete's attorney's fees.

On May 20, 1994, Salicete filed another petition for a Rule to Show Cause. This petition alleged that DiSabatino had violated the automatic restraining order again, the Family Court's order of December 14, 1993, and had abused her. The Family Court conducted a hearing on July 14, 1994. It found DiSabatino to be in contempt by going to an establishment where he knew Salicete would be a patron. It found DiSabatino had committed abuse by calling Salicete vulgar names in the presence of others.

As a sanction for the contempt, the Family Court assessed DiSabatino $3,000, to be paid to Salicete from his share of the marital estate at the time of the property division. As a sanction for the finding of abuse, the Family Court ordered DiSabatino to: participate in an anger control program; have no contact with Salicete; and turn over his fire arms to a neutral third-party. DiSabatino was also ordered to pay a portion of Salicete's attorney's fees.

On August 22, 1994, Salicete filed another petition for a Rule to Show Cause. The petition alleged that DiSabatino had violated the automatic restraining order again and the Family Court's prior orders. The Family Court conducted a hearing on November 16, 1994. It found DiSabatino in contempt of the restraining order and its prior orders by: going to Salicete's residence on August 17, 1994 at about 5:00 a.m.; honking the horn; threatening to kill her; and appearing again at her home the following day, when the early morning incident was being investigated by the police.

As sanctions for the findings of contempt, the Family Court assessed DiSabatino $6,000 for the August 17, 1994 violation and $12,000 for the August 18, 1994 violation. Both payments were ordered to be paid to Salicete by December 1, 1994. As additional sanctions, the Family Court ordered DiSabatino to: surrender his driver's license to the Division of Motor Vehicles for an occupational license

---

2. § 1509. **Preliminary injunction; interim orders pending final hearing.**

 (a) Upon the filing of a petition for divorce or annulment, a preliminary injunction shall be issued against both parties to the action, enjoining them from:

 (1) Transferring, encumbering, concealing or in any way disposing of any property except in the usual course of business or for the necessities of life, and requiring the parties to notify the other of any proposed extraordinary expenditures and to account to the Court for all extraordinary expenditures after the preliminary injunction becomes effective;

 (2) Molesting or disturbing the peace of the other party;

 (3) Removing any natural or adopted child of the parties then residing in Delaware from the jurisdiction of this Court without the prior written consent of the parties or the permission of the Court;

 (4) Utilizing credit cards or otherwise incurring any debt for which the other party is or may be liable except in connection with the martial litigation or necessities of life for the benefit of the party or the parties' minor children.

 The preliminary injunction shall be effective against the petitioner upon the filing of the petition for divorce and upon the respondent upon service of a copy of the petition.

13 *Del.C.* § 1509(a).

restricting his driving to the hours of 7:00 a.m. to 7:00 p.m. Monday through Saturday; and abide by a curfew restricting him from leaving his home after 7:00 p.m. on any day of the week. The Family Court also warned DiSabatino that any further violations would result in a home confinement program, monitored by the use of an ankle bracelet.

Salicete filed another petition for a Rule to Show Cause when DiSabatino failed to pay her the $18,000 of assessments. The Family Court conducted a hearing on December 27, 1994. The Family Court found DiSabatino in contempt for not paying $18,000 to Salicete by December 1, 1994. As a sanction for that contempt finding, DiSabatino was committed to the Department of Adult Corrections, until such time as he paid the $18,000 plus 8% interest from December 1, 1994 to Salicete. The sentence was made to be effective at noon on December 28, 1994. The Family Court stated that the sentence would be vacated upon notice that the assessment had been paid.

### Contempt Power
### Inherent Judicial Authority

 Courts have "an inherent contempt authority, ... as a power 'necessary to the exercise of all others.'" *United Mine Workers v. Bagwell,* — U.S. —, —, 114 S.Ct. 2552, 2559, 129 L.Ed.2d 642 (1994). As the United States Supreme Court has stated:

> That the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice. The courts of the United States [and Delaware], when called into existence and vested with jurisdiction over any subject, at once became possessed of the power.

*Young v. United States ex rel. Vuitton et Fils, S.A.,* 481 U.S. 787, 795, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987) ("*Young v. United States*"). By virtue of that inherent authority, courts have the power to impose either civil or criminal sanctions for contempt. *Id.* The relatively broad civil and criminal contempt power, that is inherently vested in the judicial branch of government, has been explained traditionally, as follows:

> Courts independently must be vested with "power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and ... to preserve themselves and their [judicial] officers from ... insults...."

*United Mine Workers v. Bagwell,* — U.S. at —, 114 S.Ct. at 2559 (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 227, 5 L.Ed. 242 (1821)).

The inherent contempt power of the Delaware courts and the breadth of its scope are well established. The General Assembly has provided that no conduct constitutes a crime unless it is made an offense by the "Criminal Code or by another law." 11 *Del.C.* § 202(a). In Section 202(b), however, the General Assembly expressly recognized that subsection (a) did not affect the inherent power of a court "to employ *any* sanction authorized by law for the enforcement of an order or a civil judgment or decree." 11 *Del.C.* § 202(b) (emphasis added).[3]

 Thus, independent of contempt as a statutory crime,[4] Delaware courts have the inherent power to impose criminal sanctions for contempt. Although many constitutional criminal procedural protections are required when a court invokes its inherent authority to initiate an action for criminal contempt, those "proceedings are not intended to punish conduct prescribed as harmful by the general criminal laws." *Young v. United States,* 481 U.S. at 800, 107 S.Ct. at 2133–34. Rather, "they are designed to serve the limited purpose of vindicating the authority of the court." *Id.*

 Consequently, when the court exercises its inherent contempt authority to com-

---

3. *See State v. Barron,* Colo.Supr., 677 P.2d 1370, 1373 (1984) (*en Banc*). *See also In the Matter of Daniels,* Supr., 118 N.J. 51, 570 A.2d 416, 421, *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990) (New Jersey criminal code, "while abolishing common-law crimes, preserves this judicial power to punish for contempt");

*State v. Murray,* Supr., 225 Conn. 355, 623 A.2d 60, *cert. denied,* — U.S. —, 114 S.Ct. 78, 126 L.Ed.2d 46 (1993) (legislature cannot abrogate the courts' inherent contempt power).

4. *See* 11 *Del.C.* §§ 1271, 1271A, and 1272.

mence a contempt proceeding that is of a criminal nature, it is not a criminal prosecution. *Young v. United States*, 481 U.S. at 804, 107 S.Ct. at 2136.[5] The proceeding is for an offense against the court, as an institution of public justice. *Id.* Accordingly, even a court which has no criminal jurisdiction has the inherent power to impose punishment which is criminal in nature for contempt of its orders, e.g., the Delaware Court of Chancery. *See City of Wilmington v. General Teamsters Local Union 326*, Del.Supr., 321 A.2d 123 (1974).

## Contempt
### Direct or Indirect

 Contempt can be either direct or indirect. Direct contempt occurs in the court's presence and either interrupts its proceedings or denigrates the respect that is due to the court's authority. A trial court can often punish direct contempt summarily, either by virtue of its inherent authority or by statute. *United Mine Workers v. Bagwell*, —— U.S. at ——–——, 114 S.Ct. at 2559–2560. *See also Pitts v. State*, Del.Supr., 421 A.2d 901, 905 (1980).

 The inherent authority of courts to initiate contempt proceedings, however, is not "limited to the summary punishment of in-court contempts that interfere with the judicial process." *Young v. United States*, 481 U.S. at 797, 107 S.Ct. at 2132. Courts have the inherent authority to initiate proceedings for indirect contempt, albeit not summarily. *United Mine Workers v. Bagwell*, —— U.S. at ——, 114 S.Ct. at 2557. Thus, due process mandates that actions to redress in-court (direct) and out-of-court (indirect) contempts must proceed in a different manner. *Young v. United States*, 481 U.S. at 799, 107 S.Ct. at 2133. Nevertheless, an inherent action for either direct or indirect contempt proceeds at the initiation of the court. *Id.*

## Contempt
### Civil or Criminal

 Inherent judicial actions for contempt can be either civil or criminal. The question which must always be addressed *ex ante* is: "what type of procedural protections are due before a particular contempt penalty may be imposed?" *United Mine Workers v. Bagwell*, —— U.S. at ——, 114 S.Ct. at 2557. Contempt sanctions "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.* *See* Fam.Ct. Civ.R. 70. *See also Hicks v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). Where the offense is "serious" or where the fine is more than "petty," however, criminal contempt proceedings must meet the State and Federal Constitutional requirements for the trial and punishment of crimes. *Hicks v. Feiock*, 485 U.S. at 632, 108 S.Ct. at 1429. *Compare* Del. Const. art. I, § 7. *See* Fam. Ct.Crim.R. 42.

The proper resolution of DiSabatino's appeal requires an examination of the difference between civil and criminal contempt. More than two decades ago, this Court noted that "the distinction between criminal and civil contempt is often cloudy at best." *City of Wilmington v. General Teamsters Local Union 326*, Del.Supr., 321 A.2d 123, 125 (1974). Only two years ago, the United States Supreme Court wrote that, "[a]lthough the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are less clear." *United Mine Workers v. Bagwell*, —— U.S. at ——, 114 S.Ct. at 2557.[6]

Historically, the classification of a contempt proceeding as either civil or criminal has been determined by the character and purpose of the sanction imposed:

whether a contempt is civil or criminal turns on the "character and purpose" of the sanction involved. Thus, a contempt sanction is considered civil if it "is remedi-

**5.** *See also Ballengee v. State*, Fla.App., 144 So.2d 68, 70 (1962) ("[A] prosecution for criminal contempt is not in itself a criminal case but a proceeding inherent in the court. It is *sui generis* and is not, therefore, a crime."). *Accord State v. Martina*, Supr., 135 N.H. 111, 600 A.2d 132, 135

(1991). *See State v. Howell*, Supr., 80 Conn. 668, 69 A. 1057, 1058 (1908).

**6.** *See*, Dudley, *Getting Beyond the Civil/Criminal Distinction: A New Approach to Regulation of Indirect Contempts*, 79 Va.L.Rev. 1025 (1993).

al, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court."

*United Mine Workers v. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2557 (quoting *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911)). *See also Hicks v. Feiock,* 485 U.S. at 631–634, 108 S.Ct. at 1429–31.

 The sanction of imprisonment can be imposed for either civil or criminal contempt of court. The "paradigmatic coercive, civil contempt sanction" in the form of incarceration:

> involves confining a contemnor indefinitely until he complies with an affirmative command such as an order "to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." ... Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies.... In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus "carries the keys of his prison in his own pocket."

*United Mine Workers v. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2557 (citations omitted) (quoting *Gompers,* 221 U.S. at 442, 31 S.Ct. at 498). *See Allen v. Div. of Child Support Enforcement ex rel. Ware,* Del.Supr., 575 A.2d 1176, 1179, n. 5 (1990).[7] Conversely, a fixed term of imprisonment is punitive and criminal if it is imposed retrospectively for a past act of disobedience, and cannot be avoided or abated by subsequent compliance with the court's order. *United Mine Workers v. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558; *Hicks v. Feiock,* 485 U.S. at 632–633, 108 S.Ct. at 1429–30; *Gompers v. Buck's Stove & Range Co.,* 221 U.S. at 442–443, 31 S.Ct. at 498.

 The dichotomy between civil and criminal contempt also extends to fines as a sanction. A fine is "considered civil and remedial" if it either "coerce[s] the defendant into compliance with the court's order, [or] ... compensate[s] the complainant for losses sustained." *United Mine Workers v. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558 (quoting *United States v. United Mine Workers of America,* 330 U.S. 258, 303–304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947)). If a fine is not compensatory, "it is civil only if the contemnor is afforded an opportunity to purge the obligation by compliance." *United Mine Workers v. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558. *See also Hicks v. Feiock,* 485 U.S. at 632, 108 S.Ct. at 1429. Consequently, an unconditional fine "totalling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *United Mine Workers v. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558 (citing *Penfield Co. v. SEC,* 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117 (1947)).

### Nature of This Case
### Indirect Criminal Contempt

 The question for this Court to resolve is almost identical to the one which was presented in *Bagwell:* are the non-compensatory assessments or fines imposed upon DiSabatino coercive civil or criminal sanctions?[8] In this case, after levying the initial $1500 sanction, the Family Court advised DiSabatino that assessment, and each one thereafter, would be doubled for subsequent violations. We note, as in *Bagwell,* the fact that the sanctions imposed against DiSabatino were announced in advance did not render them coercive and civil, as a matter of law. *United Mine Workers v. Bagwell,* —— U.S. at —— ——, 114 S.Ct. at 2561–2562.

The "other considerations" in *Bagwell,* which resulted in the conclusion that the fines at issue were criminal, are equally applicable in this matter. First, DiSabatino's

---

7. This Court has held that an obligor may be incarcerated upon a finding of "civil contempt for willfully violating a court order to pay child support...." *Allen v. Division of Child Support Enforcement ex rel. Ware,* Del.Supr., 575 A.2d 1176, 1179 n. 5 (1990).

8. In this case, as in *Bagwell,* no one has suggested the assessments imposed against DiSabatino were compensatory, even though they were to be paid to Salicete.

conduct "did not occur in the [Family] court's presence or otherwise implicate the court's ability to maintain order and adjudicate the proceedings before it." *United Mine Workers v. Bagwell,* — U.S. at ——, 114 S.Ct. at 2562. Second, DiSabatino's contumacy did not "involve simple affirmative acts, such as the paradigmatic civil contempts examined in *Gompers.*" *Id.*

Instead, the Family Court levied assessments against DiSabatino for "widespread, ongoing, out-of-court violations of [the automatic] injunction" and its later orders. *United Mine Workers v. Bagwell,* — U.S. at ——, 114 S.Ct. at 2562. Thus, as in *Bagwell,* the Family Court was policing DiSabatino's "compliance with an entire code of conduct that the court had itself imposed." *Id.* In *Bagwell,* it was determined that "under such circumstances," the defendants were entitled to all of the rights afforded to a defendant in a criminal proceeding. *Id.*

In particular, it was determined that the defendants were "entitled to a criminal jury trial" because "disinterested factfinding and even-handed adjudication were essential." *Id.* The United States Supreme Court has stated that the procedural protection afforded by jury trial is of heightened importance when a court exercises its inherent criminal contempt powers. *Bloom v. Illinois,* 391 U.S. 194, 201–202, 88 S.Ct. 1477, 1481–82, 20 L.Ed.2d 522 (1968). The *ratio decidendi* for that statement was a recognition that allegations of a "rejection of judicial authority" may "strike☐ at the most vulnerable and human qualities of a judge's temperament." *Id.*

The proceedings and the sanctions in this case were criminal. The sanctions imposed upon DiSabatino by the Family Court were criminal for two separate reasons: the assessments were not compensatory and the assessments were not purgeable by subse-

quent compliance. DiSabatino was entitled to the full panoply of rights that are guaranteed in a criminal proceeding for two other reasons: the assessments were serious, not petty, and the origin of each of the proceedings was DiSabatino's on-going, out-of-court violations of a judicially mandated course of conduct. *United Mine Workers v. Bagwell,* — U.S. at ——, 114 S.Ct. at 2562.

The record reflects that the Family Court denied DiSabatino the constitutional rights which are guaranteed in a criminal proceeding. Accordingly, the judgments of the Family Court must be reversed. It is necessary, therefore, to address the nature and manner of the proceedings that should be conducted when this matter is remanded to the Family Court.

### Criminal Contempt
### Family Court's Jurisdiction

▮ The General Assembly has acknowledged the inherent contempt powers of all Delaware Courts. 11 *Del.C.* § 202(b). The General Assembly has also expressly conferred upon the Family Court statutory authority to "[d]etermine and punish civil and criminal contempt." 10· *Del.C.* § 925(3).[9] The Family Court has no authority, however, to conduct a jury trial.[10] *Clements v. Family Court,* Del.Supr., 401 A.2d 72, 73 (1979).

▮ Notwithstanding a defendant's right to a jury trial in a serious criminal contempt proceeding, and the fact that the Family Court is not a "jury court," the Family Court is not divested of either its inherent or statutory criminal contempt jurisdiction. The Family Court may conduct criminal contempt proceedings so long as the defendant's right to a jury trial is preserved. *Clements v. Family Court,* Del.Supr., 401 A.2d 72 (1979). Even when a defendant has a constitutional right to a trial by jury, a bench trial in Family Court must be conducted first.[11] *Id.*

---

9. Further, 10 *Del.C.* § 925(9) empowers the Family Court to "enforce judgment in any proceeding before the Court," and 10 *Del.C.* § 925(15) enables the Court to "enter such orders against any party ... as the principles of equity appear to require." *See also Mark T. v. Judith T.,* Del. Supr., 430 A.2d 792, 793 (1981); *Walker v. State,* Del.Super., 548 A.2d 492, 496 (1987), *aff'd.,* Del. Supr., 547 A.2d 131 (1988).

10. The General Assembly could confer authority on the Family Court to conduct jury trials in criminal matters. Del. Const. art. IV, § 28.

11. In examining the policy issues of its "two-tier" holding, this Court stated:

To permit defendant a trial by court in the Family Court, followed by a trial *de novo* before a jury upon conviction may appear to fly in the face of judicial economy and the desira-

Upon conviction in the Family Court, however, the defendant does have the right to an appeal *de novo* to the Superior Court and, to elect to have a jury trial. *Id. See Evans v. Justice of the Peace Court No. 19*, Del.Supr., 652 A.2d 574 (1995).

■ Family Court Criminal Rule 42(b)[12] sets forth the procedures that must be followed in a proceeding for an action for indirect criminal contempt:

**(b) Prosecution by Complaint, Information or Petition; Prosecution by Order to Show Cause; Disqualification; Disposition.**

(1) An action for prosecution of criminal contempt may be commenced by filing of a complaint in accordance with Rule 3 or by filing by the Attorney General of an information or petition and pursued in accordance with statute and these Rules.

(2) Except when pursued in accordance with Rule 42(a) or 42(b)(1), a criminal contempt shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge or master in open court in the presence of the person charged or on application of the Attorney General or of an attorney appointed by the Court for that purpose by an order to show cause or an order of apprehension. The person charged is entitled to admission to bail as provided in these Rules.

(3) If the contempt charged involves disrespect to or criticism of a judge or master, that judge or master is disqualified from presiding at the trial or hearing except with the consent of the person charged.

(4) Upon a verdict or finding of guilt, the Court shall enter an order fixing the punishment.

Fam.Ct.Crim.R. 42(b). *Compare* Fam.Ct. Civ.R. 70.

Family Court Criminal Rule 42(b) provides that one way notice can be given is by "an attorney appointed by the Court for that purpose by an order to show cause...." Fam.Ct.Crim.R. 42(b). Since courts possess "inherent authority to initiate contempt proceedings for disobedience to their orders," that authority "necessarily encompasses the ability to appoint a private attorney to prosecute the contempt." *Young v. United States*, 481 U.S. at 793, 107 S.Ct. at 2130. Ordinarily, however, a court "should first request the appropriate prosecuting authority to prosecute contempt actions, and should appoint a private prosecutor only if that request is denied. Such a procedure ensures that the court will exercise its inherent power of self-protection only as a last resort," just as it usually considers enforcing compliance with its orders through the imposition of civil contempt before it utilizes criminal contempt as a sanction. *Young v. United States*, 481 U.S. at 801–804, 107 S.Ct. at 2134–36.[13]

■ A criminal contempt proceeding that arises out of civil litigation is "between the public and the defendant, and [is] not a part of the original cause." *Young v. United States*, 481 U.S. at 804, 107 S.Ct. at 2136. Consequently, in the event that a private

---

bility of the one trial one appeal concept. It also places time and cost burdens upon the defendant, the possibility of a more severe sentence upon conviction after a trial *de novo,* and the psychological and physical side effects upon a defendant caused by the delay of a trial *de novo.* But on balance, we are satisfied that the burdens are less than the benefits derived by the defendant from an expeditious and normally more private disposition of the case in the Family Court....
*Clements v. Family Court,* 401 A.2d at 74–75.

**12.** Superior Court Criminal Rule 42 is virtually identical to the Family Court rule regarding prosecution of criminal contempt. *In Re Butler,*

Del.Supr., 609 A.2d 1080 (1992). The Delaware Rules of Criminal Procedure are based upon, and substantially the same as, the Federal Rules of Civil Procedure.

**13.** In *Young,* the United States Supreme Court explained that "[t]he ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on the other branches.... Courts cannot be at the mercy of another branch in deciding whether such proceedings should be initiated." *Young v. United States,* 481 U.S. at 796, 107 S.Ct. at 2131–32.

attorney is appointed to prosecute a criminal contempt which arises from a civil proceeding, that attorney "should be as disinterested as a public prosecutor who undertakes such a prosecution." *Id.* Therefore, the attorney for a party that is the beneficiary of a court order in a civil proceeding "may not be appointed as a prosecutor in a [criminal] contempt action alleging a violation of that order." *Young v. United States,* 481 U.S. at 809, 107 S.Ct. at 2138.

### Conclusion

This Court has previously recognized that "[b]road discretion is vested in the [Family] Court as to the mode of execution of its contempt powers." *Mark T. v. Judith T.,* 430 A.2d at 793. Since the outcome in this appeal was controlled by the holding in *Bagwell,* some of the concluding observations of the United States Supreme Court in that opinion are appropriately restated here. *United Mine Workers v. Bagwell,* —— U.S. at —— – ——, 114 S.Ct. at 2562–2563. In particular, we note the precedent established in *Bagwell* and those precedents which remained unchanged. *Id.*

The application of the holding in *Bagwell* to the facts of this case results in some procedural constraints upon the Family Court's ability to sanction indirect contempts of certain injunctions, through the imposition of serious noncompensatory assessments or fines. *Id.* Left unaltered, however, is the longstanding authority of the Family Court to adjudicate some direct criminal contempts summarily, and to enter compensatory awards or purgeable fines for contempts through civil proceedings.[14] Although any indirect contempt cannot be adjudicated summarily, the paradigmatic civil contempts and certain other indirect contempts remain

sanctionable through civil proceedings. *United Mine Workers v. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2560. *Accord, Schmidt v. Schmidt,* Del.Supr., 610 A.2d 1374 (1992).

We recognize that there is a fine line between a civil and criminal contempt that depends on the offense and the sanction imposed. *Hicks v. Feiock,* 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). We also recognize that the conduct of DiSabatino showed such contempt for the orders of the Family Court, that the Family Court was required to act. Unfortunately, the sanctions imposed did not fully comply with what is permissible under *United Mine Workers v. Bagwell,* —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

The judgments of the Family Court are reversed. This matter is remanded for further proceedings in accordance with this opinion.[15]

---

**14.** Compensatory damages in a Family Court proceeding might include property damage, compensation for lost wages, pain and suffering and child care expenses. One court has recently awarded compensatory damages in a domestic proceeding where the amount was not clearly quantifiable:

[W]here a party provides the trial court with a reasonable basis for concluding that a compensable injury may have been suffered as a result of a willful violation of a contempt order, it is within the court's discretion to consider com-

pensation for the injury, although unliquidated, as a sanction.
*Habie v. Habie,* 654 So.2d 1293, 1295 (Fla.App., 4th Dist.1995).

**15.** Salicete's Motion for Sanctions by this Court and her alternative Motion to Remand are moot in this Court. This Court will issue a special form of mandate which vests jurisdiction over this matter immediately in the Family Court. Jurisdiction is retained in this Court only for the purpose of affording the parties an opportunity to file a Motion for Reargument.